# In the United States Court of Federal Claims

**No. 16-1221C**
**Filed: January 30, 2025**
**Reissued for Publication: February 11, 2025[1]**

```
* * * * * * * * * * * * * * * * * *
                                      *
ANTONIO MARTIN,                       *
                                      *
              Plaintiff,              *
                                      *
v.                                    *
                                      *
UNITED STATES,                        *
                                      *
              Defendant.              *
                                      *
* * * * * * * * * * * * * * * * *     *
```

**Michael D.J. Eisenberg**, Washington, DC, for plaintiff.

**Daniel Falknor**, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him were **Douglas K. Mickle**, Assistant Director, **Patricia M. McCarthy**, Director, and **Brett A. Shumate**, Acting Assistant Attorney General, Civil Division. **Maj. Nicole A. Oberjuerge**, Litigation Attorney, U.S. Army Legal Services Agency, Litigation Division, Fort Belvoir, VA, of counsel.

**O P I N I O N**

<u>**HORN, J**</u>

**FINDINGS OF FACT**

The above captioned military pay case has an unfortunate, difficult, and protracted history, given multiple Medical Evaluation Boards (MEB) Physical Evaluation Boards (PEB), and appeals, as well as the three remands requested by defendant to two different branches of the United States military in 2017, 2021, and 2023, an August 30, 2018 decision by the Army Board for Correction of Military Records (ABCMR) (the 2018 ABCMR), an April 2, 2021 decision by the ABCMR (the 2021 ABCMR) denying plaintiff's

---

[1] This Opinion was issued under seal on January 30, 2025. When asked, the parties did not propose any redactions to the January 30, 2025 Opinion, and the court, therefore, issues the Opinion without redactions for public distribution.

2018 request for reconsideration of the 2018 ABCMR,[2] a May 5, 2022 decision by the National Guard Bureau, a September 29, 2023 decision by the ABCMR (the 2023 ABCMR), multiple requests for extensions of the remand periods by defendant, including extensions spanning multiple years while the ABCMR considered plaintiff's request for reconsideration, and multiple requests to stay proceedings in this court, all of which have occurred in order to unravel the issues and clarify the positions taken by defendant based on plaintiff's medical history.

Plaintiff, Antonio Martin, was a member of the United States Marine Corps, Army, and National Guard, who was deployed to Iraq in April of 2009 to take part in Operation Iraqi Freedom. It was on this 2009 deployment to Iraq that plaintiff alleges his medical conditions began specifically when plaintiff "got stung by an insect in July 2009.[3] Plaintiff alleges that "[b]ecause Mr. Martin suffers from severe allergic reactions to such stings, his nose became inflamed from cellulitis and an abscess, requiring the Army to medevac Mr. Martin out of Iraq." (alteration added). Plaintiff "received a facial surgery to address his symptoms," which included "a swollen, warm and red nose." Upon his return to Iraq after treatment stemming from the insect sting, Mr. Martin alleges:

> About two months after being stung by that insect, Mr. Martin sustained several severe injuries—including broken ribs and a concussion—when he fell out of a Mine-Resistant Ambush Protected Vehicle ("MRAP") on September 20, 2009. After this fall, Mr. Martin was again medevac'd out of Iraq, this time requiring hernia surgery. In addition to his groin pain, Mr.

---

[2] In a May 25, 2021 status report, defendant explained: "The ABCMR reached its preliminary decision on January 28, 2021, and that decision was finalized by the representative of the Secretary of the Army on April 2, 2021."

[3] In this court, defendant originally questioned plaintiff allegation regarding the insect sting, first noting the 2014 MEB physician's consideration of plaintiff's complaints which stated "[h]e also noted the applicant first reported a bump along the right side of his nose while in Iraq, but no mention of an insect bite. Sometime after the applicant had redeployed, he began attributing the initial bump on his face to an insect bite." (alteration added). Eventually defendant conceded that an adverse reaction to a bug bite/sting was possible, noting a 2018 MEB medical advisory opinion in which the Supervisory Physician wrote "[i]n retrospect, symptoms of chest pain, breathing difficulty, headache, dizziness, and diarrhea . . . could have been the result of a venomous insect bite/allergy and/or the antibiotics given for the facial infection." (alteration added; omission in original). Defendant's cross-motion for judgment on the Administrative Record acknowledges that plaintiff suffered an adverse reaction to an insect wound, as defendant wrote, "[o]n July 4, 2009, while serving in Iraq, Mr. Martin was stung by an insect and developed a swollen, warm and red nose, and received a facial surgery to address his symptoms." (alteration added; citation omitted). This was confirmed at the oral argument when the court asked defendant's counsel of record: "What about the insect sting? Is that completed and off the table at this point?" to which defendant's counsel replied: "Yes, Your Honor. I don't think there's any remaining issues with that."

> Martin also developed degenerative changes and neuroforaminal stenosis in both the lumbar and cervical regions of his spine.

(citations omitted).

When considering plaintiff's subsequent case, the 2018 ABCMR contested that plaintiff had fallen from his MRAP. Discussing a March 2018 medical advisory opinion, the 2018 ABCMR stated that the Supervisory Physician believed "[t]he 24 September 2009 theater clinic record did record 'lost his footing and felt sharp pain in right inguinal region, <u>did not fall out of the vehicle</u>.'" (emphasis in original; alteration added). By the time of plaintiff's 2021 ABCMR, the 2021 ABCMR conceded that plaintiff had suffered injuries related to the MRAP incident, stating that:

> A DA Form 199-1 (Formal PEB Proceedings) shows a formal PEB convened on 7 October 2015 at Fort Sam Houston, TX. The applicant and his counsel appeared before the formal PEB. The DA Form 199-1 shows in Section III (Medical Conditions Determined to be Unfitting) the applicant was found unfit due to degenerative disc decease [sic] (DDD) lumbar spine and assigned a 40% disability rating. The PEB stated the condition began in 2009 when the applicant fell to the ground from an MRAP vehicle while deployed to Iraq.

(alteration added). The 2021 ABCMR further stated that "[on 19 September 2009] while driving a MRAP, he began feeling dizzy and had difficulty seeing. While stepping out to allow someone else to drive, he fell off the footstep, banged his head, and fractured a right rib." (alteration in original; internal quotation marks omitted). The 2021 ABCMR also wrote:

> Regarding the applicant's [plaintiff's] request for a records correction to show additional injuries he sustained during the 2009 MRAP accident were incurred ILD [in the line of duty; also referred to as LOD], the evidence reflects a LOD determination was completed in 2013 pertaining to injuries the applicant sustained when he fell from an MRAP in 2009 while serving in Iraq. His injuries included disc degeneration NOS [not otherwise specified] and a back injury. These injuries were determined to have been incurred ILD.

(alteration added).

The 2023 ABCMR likewise agreed that "[i]n September 2009, while on Active Duty in Iraq, the applicant suffered multiple injuries including head, back, and hip injuries following a fall from a Mine-Resistant Ambush Protected vehicle (MRAP). He was Medevac'd to Landstuhl Regional Medical Center in Germany." (alteration added). The 2023 ABCMR noted that a "DA Form 2173 [Statement of Medical Examination and Duty Status] completed on 20 September 2011, shows the applicant had a LOD for disc degeneration not otherwise specified (NOS), back, from when he fell from the back of a MRAP in Iraq while deployed in 2009." (alteration added). According to the 2023 ABCMR, plaintiff's back injuries resulting from the MRAP incident included "Degenerative disc disease (DDD) lumbar spine, rated at 40%. The narrative summary (NARSUM) indicated

3

the condition began in 2009 when the applicant fell to the ground from an MRAP vehicle while deployed to Iraq."

During the litigation in this court, defendant at first seemed to agree that plaintiff had suffered injuries resulting from a fall from a MRAP, saying in its cross-motion for judgment on the Administrative Record that "[o]n September 24, 2009, while serving in Iraq, Mr. Martin fell out of a Mine-Resistant Ambush Protected Vehicle (MRAP) and complained of sharp pain in the right inguinal region." (alteration added; citation omitted). Oddly defendant in its reply brief to the cross-motion for judgment on the Administrative Record, however, called its apparent position on plaintiff's version of the MRAP incident into question by referencing "a theater note dated September 24, 2009 stat[ing] that Mr. Martin did not fall out of the MRAP."[4] (alteration added). During oral argument, in reference to the MRAP incident, defendant's counsel of record clarified defendant's position, stating:

> It's that he didn't fall on his head, so there's just a theater note –
>
> THE COURT: Well, it doesn't say that.
>
> MR. FALKNOR: Yes, Your Honor, my apologies, and I said –
>
> THE COURT: It says he didn't fall off, or fall out of, actually, is specifically is what it says.

Later during the oral argument, the court asked defendant's counsel of record: "So we are not contesting that he came off of the vehicle," to which defendant's counsel of record responded: "No, Your Honor."

---

[4] The "theater note dated September 24, 2009," is the same medical record referenced by plaintiff's 2018 ABCMR discussing the March 2018 medical advisory opinion. The theater note, stated, in part:

> The Patient is a 47 year old male. He reported: Encounter Background Information: 47 yo ADM c/o right inguinal pn x 4days. pt states he was getting out of the drivers side of an mrap and lost his footing and felt sharp pn in right inguinal region, did not fall out of the vehicle. pt has been taking tylenol for pn sx. pt states the pn has increased. pn described as sharp shooting pn that sends small shock upwards from groin. no radiation, no numbness or tingling. rest makes it better, activity makes it worse. headaches: pt c/o generalized throbbing all over, no specific point of origin. pt states he is feeling dizzy from time to time and light sensitivity. no sound sensitivity. pt states he has been having headaches constantly since the i&d in july 2009. pt has only been taking tylenol for headaches since the surgery. pt was given sleeping pills at the SPEICHER CSH and has been using them the past three nights and only been getting 2 hours of sleep. pt states the pn is strong during waking hours.

(capitalization in original)

Throughout the proceedings, in reference to plaintiff's claims, however, defendant repeatedly challenges plaintiff's assertion that the plaintiff suffered a concussion. Defendant cites that "[s]ubsequent TBI [traumatic brain injury] and concussion screenings in October 2009 were negative," and that "[a]s noted by the [August 2017 and July 2020] ARBA [Army Review Boards Agency] medical advisory opinions, an October 2009 concussion screening reflects the applicant denied experiencing any event during his deployment that may have caused a concussion." (alterations added; citation omitted). At the oral argument on the parties' cross-motions for judgment on the Administrative Record, defendant's counsel of record reiterated the government's position that plaintiff had never suffered from a concussion while in the line of duty, stating "there is just no evidence in the record demonstrating that he had a concussion during service."

After plaintiff returned from the insect sting treatment, and especially after the fall from the MRAP, plaintiff contends he

> often complained of symptoms such as dizziness, nausea, sleeping issues, and diarrhea after his treatment. These symptoms never went away; further, within the following months, military doctors diagnosed him with chronic diarrhea, bilateral inguinal hernias, hiatal hernia, nausea, and abdominal pain.

(citations omitted).

Plaintiff was released from active duty in November of 2010, and was reassigned "to the Mississippi Army National Guard, where he continued to drill and perform military duties." Defendant notes that on December 6, 2013, after plaintiff's release from active duty,

> Mr. Martin received a permanent profile with a PULHES[5] of 313111 indicating that Mr. Martin had "one or more medical conditions or physical defects of such severity that performance of military duty must be drastically limited" for two of the six PULHES categories: "P," physical capacity and stamina, and "L," lower extremities. The profile stated that Mr. Martin was unable to perform the following tasks (1) ride in a military vehicle for at least 12 hours per day; (2) wear body armor for at least 12 hours a day; (3) wear load bearing equipment for at least 12 hours per day; (4) wear protective mask and MOPP four[6] at least two continuous hours per day; (5) move 40 pounds at least 100 yards; and, (6) live in an austere environment without

---

[5] The physical profile system is based primarily upon the function of body systems in their relation to military duties. The functions have been considered under six factors designated "P-U-L-H-E-S." "P" is general physical capacity, "U" upper extremities; "L" lower extremities; "H" hearing and ears; "E" eyes; and "S" Psychiatric. Four numerical designations (1, 2, 3 and 4) are used to reflect different levels of functional capacity, with "1" equating to a high level of medical fitness and a "4" equating to an individual with one or more medical conditions or physical defects of such severity that performance of military duty must be drastically limited.

[6] MOPP four stands for Mission Oriented Protective Posture Level 4 gear.

worsening the medical condition. Mr. Martin's PULHES profile indicated no other limitations, to include any limitations under the "psychiatric" body system. Based on his physical limitations, Mr. Martin's commander referred Mr. Martin to an MEB. The referral to the MEB did not note any comments describing mental impairment or that Mr. Martin's performance was impeded by any mental limitations attributed to posttraumatic stress disorder or traumatic brain injury.

The May 2014 MEB[7] found Mr. Martin unfit for two conditions: degenerative disc and joint disease lumbar spine, and degenerative disc and joint disease cervical spine, and found Mr. Martin fit for the various other conditions assessed in his record. Mr. Martin appealed these findings on May 14, 2014, his appeal was considered, and the findings were affirmed by the MEB on May 21, 2014.

(first footnote in original; citations omitted).The ABCMR provided further detail on the 2014 MEB proceedings, explaining:

a. The applicant did not present views in his own behalf. After consideration of clinical records, laboratory findings, and physical examination the [medical evaluation] board found the applicant had the following medical conditions/defects –

- medically unacceptable conditions –
    - degenerative disc and joint disease lumbar spine
    - degenerative disc and joint disease cervical spine
- medically acceptable conditions (meets retention standards)
    - right shoulder strain
    - subjective right elbow pain
    - right wrist possible tendinitis
    - degenerative joint disease left hand second finger distal interphalangeal (DIP) [end] joint
    - subjective right hand pain
    - irritable bowel syndrome
    - acute erosive gastritis
    - inguinal hernia, bilateral status-post repair
    - bilateral hip pain, no pathology noted
    - bilateral knee pain, no pathology noted
    - unspecified trauma related disorder
    - scar right side of face (right mid-nose to lateral margin of right upper lip)
    - history of acute otitis media, resolved
    - allergic rhinitis
    - GERD [gastroesophageal reflux disease]
    - hiatal hernia

---

[7] The court notes that the Administrative Record reflects that the MEB was convened on March 28, 2014.

- asthma
- headache syndrome
- tinea pedis
- TBI

b. The MEB found the applicant did not meet retention standards under the provisions of (UP) [Under the Provisions] AR 40-501 (Standards of Medical Fitness), chapter 3 (Medical Fitness Standards for Retention and Separation, Including Retirement), and referred him to a PEB. On 8 April 2014, the findings and recommendation were approved.

c. On 14 May 2014, the applicant was informed of the findings and recommendation of the MEB. He indicated that he did not agree with the board's findings and recommendation, and he submitted his appeal. He contended that the diagnoses of TBI and unspecified trauma related disorder should be found to fail medical retention standards. He acknowledged that the MEB accurately covered all of his current medical conditions.

d. On 19 May 2014, Doctor M.D. B___, MEB Physician, considered the applicant's appeal. He found no evidence of head injury related to an incident in September 2009 and added a post-demobilization medical note was completely negative concerning any head injury. Additionally, there were no medical records that showed the applicant sought medical attention for a head injury or a rib fracture claimed to have occurred at that time; an injury that would compel anyone to seek immediate medical care. He also noted the applicant first reported a bump along the right side of his nose while in Iraq, but no mention of an insect bite. Sometime after the applicant had redeployed, he began attributing the initial bump on his face to an insect bite. The doctor found no evidence of cognitive disorder and recommended the diagnoses as failing retention standards, as listed on the MEB proceedings, remain unchanged.

e. On 21 May 2014, the applicant was notified that his appeal was considered and the original findings and recommendation were confirmed.

(second alteration in original; surname redacted in original).

On August 6, 2014, plaintiff responded to orders to attend an August 8–10, 2014 Inactive Duty Training. Plaintiff "was traveling by motorcycle" to training "when he was struck by another car." The 2018 ABCMR indicated:

Counsel states the applicant was to report to the military base in Fulton, MS (zip code 38843), for home station Multiple Unit Training Assembly (MUTA) drills on 8, 9, and 10 August 2014. He lived in Homestead, FL (zip code 33030), approximately 1,000 miles away from Fulton, MS, and he traveled by personal vehicle. The applicant's supervisor knew his address and was aware of his travel situation. He adds that the Joint Federal Travel Regulation (JFTR) allows 350 miles per day for travel time. He states, "It

would take [the applicant] 3 days (350 miles + 350 + 300 = 1,000 miles) to travel safely to Fulton, MS under regulations." This required the applicant to begin travel on 6 August 2014 in order to arrive and report for the MUTA on time.

(alteration in original).

Plaintiff contends that "[t]his [motorcycle] accident exacerbated his documented degenerative disc disease in his cervical and lumbar spine." (alterations added). Defendant, in its cross-motion for judgment on the Administrative Record, agreed, stating:

Mr. Martin's August 6, 2014, motorcycle accident exacerbated Mr. Martin's back and neck conditions. A December 17, 2014, neurology exam diagnosed cervical and lumbrosacral [sic] radiculopathy that was connected to Mr. Martin's motorcycle accident. A February 2015 electromyograph and nerve conduction study showed normal lower extremity motor and sensory function. A March 2015 upper extremity nerve conduction study and right upper electromyograph confirmed right upper extremity radiculopathy. A December 2015 neck MRI showed multilevel degenerative disc disease with moderate right and mild left neural foraminal stenosis.

(alteration added; citations omitted).

According to defendant, "[a] January 2015 informal PEB was convened to consider Mr. Martin's unfitting conditions." (alteration added). The January 2015 informal PEB upheld the findings of the 2014 MEB, rating plaintiff's cervical and lumbar conditions at a combined 60% disability rating. Plaintiff "appealed the findings and recommendation of the informal PEB." As described by the 2018 ABCMR, the process leading up to this appeal was as follows:

12. On 12 May 2015, applicant's counsel submitted a contingent to the formal PEB for consideration. He contended that the PEB failed to consider several unfitting conditions resulting from the incident on 17 September 2009 and that the VA had granted the applicant service connected disability, specifically for PTSD, headache syndromes, unspecified trauma related disorder with a history of TBI [traumatic brain injury], right upper extremity radiculopathy, and residuals of right clavicle fracture.

13. On 13 May 2015, the President of the PEB, Joint Base San Antonio – Fort Sam Houston, TX, notified the Commander EAMC [Eisenhower Army Medical Center], Fort Gordon, GA, to address the following issues: PTSD, headache syndrome, unspecified trauma related disorder with TBI, right upper extremity radiculopathy with left upper extremity, right and left lower extremity radiculopathy, and right clavicle fracture. Injuries the applicant claimed he sustained in a motor vehicle accident in August 2014 were also noted and information related to the matter was also requested.

14. On 5 June 2015, Doctor M.D. B___, MEB Physician, reconsidered the applicant's case. He reviewed the applicant's deployment and post-deployment military service, his military and VA medical records, and he provided a summary of each claimed medical condition.

a. He found that "right upper extremity radiculopathy" needed to be added as a condition failing retention standards.

b. He found left upper extremity radiculopathy, cervical radiculopathy, bilateral lower extremity sciatica, right clavicle fracture, unspecified trauma related disorder, cognitive disorder, and TBI all have been appropriately listed as meeting retention standards.

c. He found no diagnosis of PTSD.

(surname redacted in original). During this time, between plaintiff's notification of appeal of the informal PEB findings and reconsideration of the case on appeal by the formal PEB, the Commanding Officer of the Missouri National Guard released a September 24, 2015 opinion, determining that plaintiff's August 6, 2014 motorcycle accident had not occurred in the line of duty. The September 24, 2015 Missouri National Guard opinion stated:

1. SPC [Specialist] Martin Antonio [sic] is not required a LOD for time of accident that occurred 6 August 2014. Drivers [sic] report shows SPC Martin to be out of compliance with current POV/POM guidance, SM did not have insurance at the time of the accident. SM [Specialist Martin] is not current with motor cycle [sic] riders education requirements, has not attained advanced riders course in the specified time frame, his basic rider course does not have a date and was not submitted to unit until September of 2015.

2. SPC Martin is and [sic] M-Day Soldier, and current LOD guidance is that SM has to be on IDT [inactive duty training], ADT [Active Duty Training], title 10 [federal active duty] or 32 [state active duty], ADOS [Active Duty Operational Support], or MOB [mobilization] status. SM was not in and [sic] IDT status until 9 August 2014.

(alterations and footnotes added).

The October 2015 proceedings of the formal PEB on appeal were described by the 2018 ABCMR, as follows:

16. On 1 October 2015, applicant's counsel submitted matters to the formal PEB for consideration. He rebutted the 25 August 2015[8] LD [line of

---

[8] As opposed to the "September 24, 2015" date included in the Missouri National Guard opinion, as discussed above, August 25, 2015 appears to be the date on which the line of duty decision was first communicated to plaintiff; as reflected in the 2023 ABCMR decision, which stated "[o]n 25 August 2015, the PEB notified him [Mr. Martin] that his unit determined that he was not on orders at the time of his motorcycle accident and,

duty] memorandum. He noted the board raised two issues of concern (i.e., LD and medical) in an attempt to deny the applicant a proper disability separation.

a. He asserted the applicant's medical issues stemmed from his service in Iraq in 2009 and 2010, so the issue of a LD status determination is moot. Additionally, the correct date of the accident was 6 August 2014, which occurred while the applicant was traveling directly to a drill (MUTA-4) on 9–10 August 2014.

b. He restated that the VA had granted the applicant service connected disability for PTSD, headache syndromes, unspecified trauma related disorder with history of TBI, right upper extremity radiculopathy, and residuals of right clavicle fracture. He added that the VA had also granted the applicant service connection for GERD, hiatal hernia, irritable bowel syndrome, gastritis and cholelithiasis.

17. A DA Form 199-1 (Formal PEB Proceedings) shows a formal PEB convened on 7 October 2015 at Fort Sam Houston, TX. The applicant and his counsel appeared before the formal PEB.

a. Section III (Medical Conditions Determined To Be Unfitting) shows the following conditions (as categorized by VA Schedule for Rating Disabilities (VASRD) codes) were found unfitting –

▪    VASRD Codes 5242-5243 – DDD [degenerative disc and joint disease] lumbar spine (MEB Diagnosis 1) – 40%
▪    VASRD Codes 5242-5243 – DDD cervical spine (MEB Diagnosis 2) – Non-Compensable (Not Rated)
▪    VASRD Code 8513 – right upper extremity radiculopathy (MEB Diagnosis 3) – Not Unfitting

(1) MEB Diagnosis 1 – the condition began in 2009 when the applicant fell to the ground from an MRAP vehicle while deployed to Iraq.

(2) MEB Diagnosis 2 – the preponderance of the evidence confirmed that the condition was not incurred while the applicant was entitled to basic pay or that it was aggravated by service. (The informal PEB had presumed the condition to be ILD.)

(3) MEB Diagnosis 3 – the [formal physical evaluation] board found the applicant fit for this condition.

b. The applicant provided sworn testimony of driving his motorcycle from Groveton, GA, or Vero Beach/Homestead or Miami, FL, to Fulton, MS, several times between November 2010 and 9 August 2014 to attend Battle Assemblies, one IDT [inactive duty training], and one Field Training

---

therefore, conditions that developed as a result of this accident would be determined as non-compensable." (alterations added).

Exercise. He also testified that the motor vehicle accident on 6 August 2014 occurred while he was on his way to Fulton, MS for drill beginning on the 9th of August 2014 and he was attempting a trip of approximately 950 miles on a Harley Davidson motorcycle while he was unable to tolerate more than 2 to 4 hours per day on a motorcycle.

 c. The formal PEB also addressed the additional unfitting conditions claimed by the applicant and his counsel and found those conditions not unfitting.

 d. The board [formal PEB] found the applicant physically unfit and recommended a rating of 40% with permanent disability retirement.

(alterations and footnote added; emphasis in original).[9]

According to the 2018 ABCMR, shortly after the conclusion of the October 2015 formal PEB proceedings:

 e. On 19 October 2015, the applicant indicated that he did not concur with the PEB proceedings and he would appeal.

 18. On 20 October 2015, applicant's counsel submitted a brief to the PEB on behalf of the applicant. He asserted that while the applicant was serving in Iraq, all of the injuries he sustained (i.e., from falling out the [sic] MRAP vehicle, while performing field duty, and when he was bitten by an insect) were ILD. Also, the injuries that he sustained and those previous conditions that were aggravated from a motor vehicle accident on 6 August 2014 were ILD. Therefore, the right upper extremity radiculopathy condition is unfitting and the DDD [degenerative disc and joint disease] cervical spine condition is compensable. He added the PEB failed to properly consider the additional conditions that they deemed to be not unfitting.

 19. On 27 October 2015, his counsel submitted a Veterans Administration Request for Reconsideration (VARR) to the PEB on behalf

---

[9] The appeal results were further summarized by defendant in its cross-motion for judgment on the Administrative Record:

Mr. Martin submitted his case to the formal PEB, and an October 2015 formal PEB considered Mr. Martin's case and rated his conditions. The PEB rated Mr. Martin's degenerative disc disease lumbar spine condition at 40%. The PEB further determined that Mr. Martin's cervical spine condition was not compensable, because Mr. Martin had incurred this condition in an August 6, 2014 motorcycle accident, while traveling to a Field Training Exercise from 950 miles away. The PEB further concluded, contrary to the MEB physician's opinion discussed above, that Mr. Martin's right upper extremity radiculopathy condition was not unfitting. The PEB found Mr. Martin physically unfit and recommended a rating of 40% with permanent disability retirement.

of the applicant. He noted the VA rated the applicant appropriately and/or adequately, as follows –

- headache syndromes – 50%
- unspecified trauma related disorder with history of TBI– 50%
- lumbar spine degenerative disc and joint disease with intervertebral disc syndrome – 40%
- cervical spine degenerative disc and joint disease with degenerative arthritis and intervertebral disc syndrome – 30%
- asthma – 30%
- GERD, hiatal hernia, irritable bowel syndrome, gastritis and cholelithiasis – 30%
- right upper extremity radiculopathy – 30%
- residuals of right clavicle fracture – 20%
- right lower extremity sciatic radiculopathy – 20%
- tinnitus – 10%
- scar, right nasal fold due to carbuncle excision (painful) – 10%
- chronic sinusitis – 0%
- allergic rhinitis – 0%
- bilateral inguinal hernia – 0%
- erectile dysfunction – 0%
- voiding dysfunction (benign prostatic hypertrophy with incontinence) – 0%
- scar, right nasal fold due to carbuncle excision – 0%
- scars, residual of bilateral inguinal hernia – 0%
- bilateral tinea pedis – 0%
- residuals of right 12th rib fracture – 0%
- eligibility to Dependents Educational Assistance
- special monthly compensation based on loss of use of a creative organ

20. The VA issued a memorandum to the PEB, dated 23 November 2015, subject: Request for Reconsideration of Integrated Disability Evaluation System (IDES) Proposed Rating Decision, pertaining to the applicant.

a. It shows the issue of earlier effective dates was outside the VA's reconsideration jurisdiction for the following conditions –

- TBI
- right upper extremity radiculopathy
- right clavicle fracture
- right lower extremity radiculopathy
- right 12th rib fracture
- Dependents Educational Allowance

b. The VA Decision Review Officer noted that reconsideration is limited to the evaluation assigned to a condition referred by the PEB as unfitting.

21. On 3 December 2015, the President, PEB, notified the applicant that following the review of his case, the board adhered to the original findings and recommendation of the formal proceedings. The applicant was provided an explanation for each of the conditions considered and found to be not unfitting.

(alterations added).

In December of 2015, the United States Army Physical Disability Agency (USAPDA) overruled the 2015 formal PEB, accepting the recommendations of the June 5, 2015 medical advisory opinion and finding plaintiff unfit for degenerative disc disease lumbar spine, degenerative disc disease cervical spine, and right upper extremity radiculopathy, at a total disability rating of 70%. Plaintiff was found fit for all other conditions.

Regarding these findings of the USAPDA, defendant, in its cross-motion for judgment on the Administrative Record, summarizes:

On December 15, 2015, the USAPDA issued an administrative correction to the findings of the PEB. USAPDA found Mr. Martin unfitting for all three of the conditions originally found unfitting by the MEB: degenerative disc and joint disease, both lumbar and cervical spine, as well as right upper extremity radiculopathy. In reaching this conclusion, USAPDA concluded that Mr. Martin had injured his neck in a fall from a vehicle while serving in Iraq, and that this condition did not meet retention standards "even before" Mr. Martin's August 6, 2014 motorcycle accident. USAPDA also rated Mr. Martin's cervical spine and right upper extremity conditions together, rating them at 30%. Combining Mr. Martin's ratings, USAPDA rated him at 70%.

(citations omitted).

The results of the USAPDA action were accepted by defendant. The 2018 ABCMR explained that "[o]n 15 December 2015, the Chief, Operations Division, USAPDA, Arlington, VA, approved the revised PEB proceedings." Also on December 15, 2015, "the Chief, Operations Division, USAPDA, notified the applicant that, following a review of his entire case, it was determined that an administrative change to his findings was appropriate. He was informed his combined rating for the three (3) unfitting conditions was 70%. He was also provided a copy of the revised PEB proceedings." (alterations added). Plaintiff lists December 15, 2015 as the date of his discharge.

The ABCMR provided the sequence of events that led to plaintiff's discharge:

h. On 7 January 2015, a Physical Evaluation Board (PEB) found that the applicant was physically unfit and recommended that he be medically retired from the Army.

i. Following a 12 May 2015, [sic] PEB hearing, the applicant's case was recessed for further consideration of PTSD, headache syndrome, unspecified trauma disorder with traumatic brain injury (TBI), right upper extremity radiculopathy with left upper extremity, right and left lower extremity radiculopathy, and right clavicle fracture.

j. On 25 August 2015, the PEB notified him that his unit determined that he was not on orders at the time of his motorcycle accident and, therefore, conditions that developed as a result of this accident would be determined as non-compensable.

k. On 1 October 2015, the applicant appealed the 25 August 2015, LOD [line of duty] determination because, pursuant to AR 600-8-4 (Line of Duty Policy, Procedures, and Investigations), paragraph 2-2(e)(4), he was traveling directly to perform inactive duty training.

l. On 3 December 2015, despite his appeal and medical records in support, the PEB found that his right upper extremity radiculopathy was not unfitting and that the disability degenerative disc disease in his cervical spine was not compensable because his motorcycle accident was not in LOD.

m. On 15 December 2015, he was notified that he would be permanently retired from the Army with a disability rating of 70%.

n. On 19 January 2016, the applicant was placed on the retired list.

(alterations added).

Subsequently, plaintiff filed the above captioned complaint on September 29, 2016,[10] in the United States Court of Federal Claims. Plaintiff alleged that:

This Court has jurisdiction to hear cases founded under the laws of the United States or the Constitution seeking monetary damages from the United States Government. 28 U.S.C. 1491(a)(1). This code gives this Court jurisdiction to hear cases against the United States Army. The Tucker Act, 28 U.S.C.S. § 1491, grants the U.S. Court of Federal Claims jurisdiction to render judgment against the United States for damages on various types of claims, including any non-tort claim founded on the U.S. Constitution, a statute, or an executive department regulation. 28 U.S.C.S. § 1491(a)(1). That portion of the Tucker Act has been construed to require that the source of substantive law on which the Plaintiff relies be money-mandating. The money-mandating statute that Plaintiff relies on here is the Military Pay Act. 37 U.S.C. § 204.

---

[10] As described above and discussed below, proceedings in this court resulted in a total of three remands: two to the ABCMR in 2017 and 2023, and one to the National Guard Bureau in 2021.

(internal references omitted). Plaintiff further argued that:

It was wrongful for the United States Army ("Army") to transfer and then later discharge Plaintiff before the following medical conditions were addressed:

a. On or about December 3, 2015, the Department of the Army's Physical Evaluation Board ("PEB") failed to properly accept some of Specialist Martin's conditions and ruled an exacerbating [motorcycle] accident was not in the line of duty.

b. The PEB failed to properly evaluate the Plaintiff for post-traumatic stress disorder ("PTSD") as well as his diagnoses for radiculopathy, residual for right clavicle fracture, and gastrointestinal conditions.

c. The PEB's action on December 5, 2015, to deny Plaintiff proper consideration of his medical conditions and the Army's subsequent discharge of Plaintiff was arbitrary and capricious.

(alteration added).

As relief for the alleged wrongful discharge, plaintiff sought a decision in the following paragraphs of his complaint:

32. Holding that the PEB's December 2015 decisions to deny Plaintiff in depth evaluations for all of his medical conditions as both incorrect and arbitrary and capricious.

33. Either:

a. Ordering the Army to provide Plaintiff with a rating commensurate to the appropriate ratings and LODs [line of duty determinations] as plead above; or

b. Remanding the issue to the PEB with specific guidelines in conjunction with Plaintiff's arguments and evidence.

34. Awarding Plaintiff lost pay and benefits, and his costs and attorney's fees, including Equal Access to Justice Act fees for this action.

35. Granting such other relief as the Court deems just and proper.

(alteration added).

In response to plaintiff's complaint, defendant filed a January 12, 2017 motion:

to remand this matter to the Army with the following directions:

(1) to ascertain whether United States Army Physical Disability Agency (USAPDA) contemplated Mr. Martin's condition before or after Mr. Martin's August 6, 2014 motorcycle accident, in making its disability rating determination;

(2) if the USAPDA only considered Mr. Martin's condition before the accident, the Army will request the appropriate authority to determine whether a line of duty investigation is necessary regarding the August 6, 2014 motorcycle accident, and if so, to conduct it. If a line of duty investigation is not necessary, the appropriate authority will provide an explanation why;

(3) if a line of duty investigation is necessary and the investigation determines that the motorcycle accident was in the line of duty, the appropriate authority will forward the investigation to the USAPDA. The USAPDA will then determine whether the effects of the accident necessitate a change in Mr. Martin's current disability rating.

Plaintiff consented to a remand and the parties jointly filed a February 10, 2017 motion for remand,[11] which instructed:

I. First, the ABCMR will determine whether error or injustice resulted from:

a. the PEB's failure to address Mr. Martin's argument that the August 6, 2014, motorcycle accident occurred in the line of duty pursuant to 10 U.S.C. § 1204, and

b. the PEB's failure to forward Mr. Martin's record to the National Guard Bureau so that a line of duty determination for the August 6, 2014 motorcycle accident that would consider Mr. Martin's status under 10 U.S.C. § 1204(2)(b)(ii) could be performed.

II. Second, the ABCMR will determine whether there is an error or injustice in Mr. Martin's records pertaining to his disability rating.

III. Third, in addition to making its own analysis of the record to make the determinations above, and recording its reasoning for each determination, the ABCMR will evaluate and respond to each and every argument Plaintiff' [sic] raised in his

a. October 1, 2015 appeal addressed to the formal PEB, and his

b. October 20, 2015 appeal addressed to the formal PEB including Mr. Martin's allegation that he should have been referred for medical disability processing in 2010

(alteration added; citations omitted).

This court granted the first case remand to the agency in a February 13, 2017 Order, which instructed the ABCMR to

address, among other issues, whether error or injustice resulted from the PEB's failure to address Mr. Martin's argument that the August 6, 2014,

---

[11] The court notes that the plaintiff initially opposed the remand in part, but after further discussions between the parties, the parties filed a joint motion for remand.

motorcycle accident occurred in the line of duty pursuant to 10 U.S.C. § 1204, and the PEB's failure to forward Mr. Martin's record to the National Guard Bureau so that a line of duty determination for the August 6, 2014 motorcycle accident that would consider Mr. Martin's status under 10 U.S.C. § 1204(2)(b)(ii) could be performed. In addition the ABCMR shall address whether there is an error or injustice in Mr. Martin's records pertaining to his disability. The ABCMR shall also evaluate the arguments raised by Mr. Martin in his appeals to the formal PEB.

In its August 30, 2018 decision, the 2018 ABCMR determined:

> The Board carefully considered the issues referred by the Court and those presented by the applicant and his counsel, specifically whether error or injustice resulted from the [2015 formal] PEB's: (1) failure to consider injuries he sustained in 2009 while serving in Iraq and that were found to have been incurred ILD; (2) failure to obtain a LD status determination from the NGB [National Guard Bureau] pursuant to 10 USC [§] 1204 pertaining to the applicant's 6 August 2014 motorcycle accident; (3) failure to consider injuries he sustained and that were exacerbated by the accident on 6 August 2014; and (4) the findings and disposition (separation) of the applicant. The Board also considered the issue raised by counsel that the applicant's military medical records be corrected to show all his unfitting conditions.

(alterations added). For the first issue considered by the ABCMR, as listed above, 2018 ABCMR found:

> a. Issue 1: The [2015 formal] PEB's failure to consider injuries the applicant sustained in 2009 while serving in Iraq.
>
> b. Records show a LDI [line of duty investigation] was completed pertaining to injuries the applicant sustained when he fell from an MRAP in 2009 while serving in Iraq. His injuries included disc degeneration NOS [not otherwise specified] and a back injury.
>
> c. His injuries were determined to have been incurred ILD and the LD [line of duty determination] was approved.
>
> d. There is no evidence of record that shows the applicant appealed the injuries documented in the LDI or the findings of the LDI.
>
> e. The approved LDI was available for review and consideration by the MEB and the PEB throughout the entire IDES [Integrated Disability Evaluation System] evaluation process.

(alterations added). For the second issue, the 2018 ABCMR stated:

> 9. Issue 2: The [2015 formal] PEB's failure to obtain a LD status determination from the NGB pursuant to 10 USC [§] 1204 pertaining to the applicant's 6 August 2014 motorcycle accident.

a. Counsel argues that the applicant was authorized 3 travel days based on the 350-mile per day travel authorization specified in the JFTR [Joint Federal Travel Regulation] and that the applicant's injuries were sustained "while traveling directly to" the place at which the applicant was to perform IDT [inactive duty training].

b. It is not clear why the applicant affiliated with a MSARNG [Mississippi Army National Guard] unit that was located nearly 1,000 miles from his residence (and located in another state). In any event, this is not the essential issue under consideration.

c. It cannot be definitively determined from the available evidence of record the mode(s) of transportation the applicant utilized to travel to unit MUTA's [Multiple Unit Training Assembly] prior to the MUTA–4 under review. Based on the evidence of record, it is as likely as not, and therefore reasonable to conclude, that the applicant usually travelled by commercial airliner to attend MUTAs at his MSARNG unit. Nonetheless, the Board accepts the contention that he was traveling by motorcycle to IDT in Fulton, MS. However, the Board notes, in this case, the method of transportation the applicant chose was not the best mode of transportation as instructed by guidance in the Army regulation governing LDIs.

d. Records show the unit scheduled a MUTA-4 from 8–10 August 2014.

(1) The evidence of record shows the applicant began his travel on 6 August 2014 and the distance (1,000 miles (counsel's estimate)) required 3 full days of travel (i.e., 6, 7, and 8 August).

(2) The evidence of record also shows the applicant stated the motor vehicle accident on 6 August 2014 occurred while he was on his way to Fulton, MS, for drill beginning on 9 August 2014. He also acknowledged that he was attempting the trip of approximately 950 miles on a motorcycle even though he was unable to tolerate more than 2 to 4 hours per day on a motorcycle. (The Board notes that being able to travel (at most) 4 hours per day would equate to traveling about 250 miles per day and would require 4 travel days. The Board also notes the applicant started his trip on 6 August 2014.)

(3) If the applicant was authorized the 3 travel days specified, then he would not have been required to report for duty until 9 August 2014. The Board notes that in counsel's submissions to the PEB he indicated the applicant was required to report on both dates (i.e., 8 and 9 August 2014).

(4) The evidence of record shows the applicant did not depart in sufficient time to arrive on time (i.e., on either 8 or 9 August 2014) for the scheduled IDT.

e. The evidence of record shows the most direct travel route from Homestead, FL, to Fulton, MS, in pertinent part, is the Ronald Reagan (Florida) Turnpike while traveling in Florida.

(1) The evidence of record also shows the applicant began his travel from Homestead by motorcycle at approximately 1000 hours on 6 August 2014. He traveled about 20 miles (a period of about 30 minutes), deviated from traveling north on the Ronald Reagan Turnpike, and was involved in a motor vehicle accident approximately 2 miles off of the direct travel route.

(2) There is no evidence of record that shows the applicant was experiencing mechanical problems when he deviated from the direct travel route. It is unlikely he required a comfort break or nourishment after traveling for a period of about 30 minutes.

(3) The applicant's commander confirmed that the applicant was not entitled to basic pay on 6 August 2014 and that he was not traveling directly to the IDT at the time of the motor vehicle accident.

f. The governing Army regulation shows the longest distance a Soldier can be expected to travel between his or her residence and a site where IDT will be conducted is a distance within a 50-mile radius of the IDT site and it will not exceed 1 and 1/2 hours of travel time one-way by car under average traffic, weather, and road conditions. An alternative reasonable commuting distance for enlisted Soldiers can be applied of a 100-mile radius of the IDT site when it will not exceed 3 hours of travel time one-way by car under average traffic, weather, and road conditions, and the unit normally conducts MUTA–4 on 2 consecutive days (and Government-provided meals and quarters are furnished at the training site).

g. The anecdotal evidence that the applicant's "supervisor" was aware of the applicant's address (not specified) is noted. However, this does not relieve the applicant of his responsibility of complying with the governing Army regulatory criteria concerning "reasonable commuting distance" and obtaining the approval of his commander.

(1) There is no evidence of record that the commander approved the applicant's commuting distance (from Homestead, FL) and it is reasonable to conclude that the commander would not approve such a request.

(2) It logically follows that the commander was correct when he certified that the applicant was not in an authorized travel status or entitled to basic pay on 6 August 2014.

h. The applicable statute (10 USC 1074a [10 U.S.C. § 1074a(a)(2)(B)]), in pertinent part, shows it governs those individuals who incur or aggravate an injury while remaining overnight immediately before the commencement of IDT at or in the vicinity of the site of the IDT. This was clearly not the case as pertains to the accident the applicant was involved in on 6 August 2014.

i. Based on all of the foregoing, there was no requirement for the Army to conduct a LDI for the 6 August 2014 accident because the applicant was not in an authorized travel status, he was not entitled to basic pay, he was not traveling on the day immediately before commencement of IDT, and/or traveling directly to the place at which he was to perform IDT.

(alterations added). For the third issue, the 2018 ABCMR stated:

10. Issue 3: The [2015 formal] PEB's failure to consider the injuries he sustained and that were exacerbated by the accident on 6 August 2014.

a. The evidence of record, as outlined above, clearly shows the applicant was not in an authorized duty status (i.e., entitled to basic pay and/or traveling directly to IDT) at the time of the 6 August 2014 motor vehicle accident.

b. As a result, the incident did not require a LDI. Accordingly, any injuries he sustained (or any previous injuries or conditions that may have been aggravated as a result of the accident) did not require a LD determination, as they were not the result of (or aggravated by) an ILD incident.

(alteration added). For the fourth issue, as well as plaintiff's counsel's contention regarding the correction of records to show additional unfitting conditions, the 2018 ABCMR stated:

11. Issue 4: The [2015 formal] PEB's findings and disposition, and the additional issue raised by counsel that the applicant's military medical records be corrected to show all his unfitting conditions.

a. The evidence of record shows the applicant's case was fully considered under the IDES [Integrated Disability Evaluation System], including by the MEB with appeal, the VA by assigning VASRDs [Veterans Affairs Schedule for Rating Disabilities] and providing disability ratings for the medically unacceptable conditions, the informal PEB with appeal, the formal PEB with appeal, and review by the USAPDA. Clearly, the applicant was afforded due process regarding the identification, consideration, and categorization of all his medical conditions.

b. There is no evidence of record that shows the applicant or his counsel appealed the applicant's case to the Physical Disability Review Board. They voluntarily requested the Court remand the case to the ABMCR. As such, they foreclosed on the opportunity for review of the applicant's case by the Physical Disability Review Board.

c. During the course of this Board's review, the ARBA Medical Advisor concluded that the applicant's medical conditions were duly considered during his medical separation processing. Additionally, he found no evidence of a medical disability or condition which would support a change to the character, reason, or disability determination(s) for the

discharge in this case. The MEB Supervisory Physician reviewed the medical advisory and agreed that the ARBA medical advisory was "quite thorough and accurate."

d. The Board reviewed the [August 2017] ARBA medical advisory opinion, the [March 2018] MEB medical advisory opinion, and counsel's response/rebuttal to those advisories. All three documents provided the Board additional detailed information and insight into the applicant's case (i.e., specifically, his medical conditions) and the entire IDES process. The Board recognizes that analysis by different advisors may not encompass every aspect/facet of the case and, therefore, may result in differing opinions and conclusions. Thus, the Board gave careful consideration to counsel's rebuttal to the two medical opinions and conclusions.

e. Despite the differences, the evidence of record clearly shows the applicant's medical conditions were duly considered during his medical separation processing. When changes to the applicant's conditions occurred during the course of his military service, that information was considered. Information provided by the applicant and/or his counsel was also considered throughout the entire IDES process. In addition, when error or omission was discovered, the MEB/PEB exercised appropriate action to correct the proceedings.

f. The evidence of record fails to support the applicant's and his counsel's contention that the findings of the MEB or the PEB were arbitrary, capricious, and/or contrary to the law.

(alterations added). The 2018 ABCMR concluded "[i]n light of the foregoing, the Board finds that the applicant has failed to demonstrate by a preponderance of evidence that an error or injustice occurred in this case." (alteration added).

Shortly after the decision of the 2018 ABCMR on the first remand was filed with the court, on November 30, 2018, defendant filed a status report notifying the court that "Mr. Martin has informed us that Mr. Martin intends to move for a stay of this case pending a request for reconsideration to the ABCMR based on new factual and legal argument. We do not oppose this motion." That same day, plaintiff filed a motion to stay plaintiff's case during reconsideration of the ABCMR's decision, which the court granted on December 6, 2018.

After consideration of more than two years, in a January 28, 2021 decision, the ABCMR denied plaintiff's motion for reconsideration stating:

1. After reviewing the application and all supporting documents, the Board found relief is not warranted.

2. The Board carefully considered counsel's contentions, including those contentions raised during the course of the applicant's appeals to the PEB, the available service records, the available medical records, and the advisory opinions provided for consideration with the previous case as well

as the current case. Counsel requests corrections to the LOD determination regarding a 2009 MRAP incident and that a 2014 motor vehicle accident be found ILD. Counsel also contends the applicant is entitled to a 100 percent disability retirement both in 2010 and 2014. The Board found the applicant has not demonstrated by a preponderance of the evidence the existence of an error or injustice to support granting the requested relief.

a. Counsel contends the applicant was unfit at the time of his 2010 REFRAD [release from active duty] from active duty as a result of behavioral health conditions, TBI, and other physical disabilities. The Board considered the evidence of record, to include the applicant's lay statements, the contemporaneous medical evidence, the [2014] medical advisory opinion from Dr. B_ [plaintiff's Independent Medical Expert] and evidence submitted by the applicant, the [2017 and 2020] ARBA medical advisory opinions, and the [2018] MEB supervisory physician's advisory opinion, and determined the greater weight of the evidence reflects the applicant met medical retention standards at the time of his 2010 REFRAD. The mere presence of a disability, to include PTSD, TBI, GERD, or radiculopathy, does not of itself, reflect a failure to meet retention standards or unfitness for military service. The Board found the ARBA and MEB medical advisories [sic] opinions reflecting that the applicant met retention standards at the time of the 2010 REFRAD to be more persuasive when compared with the medical opinion by Dr. B_, because the ARBA and MEB advisory opinions were based upon a review and assessment of the contemporaneous medical evidence, whereas Dr. B_'s assessment appears based almost entirely on the applicant's after-the-fact self-reporting – self-reporting that is often directly contradicted by the contemporaneous medical evidence or other statements by the applicant.

b. Counsel contends that the ABCMR should apply the logic of the Haselwander [sic] decision in this case and create, or re-create, medical records that conform to the applicant's version of events. The Board agreed with the previous panel's conclusion that, in effect, the Haselwander [sic] decision does not provide an imperative to do so in this case. Counsel also asks the Board to work with VA to create VA records, to include a TBI DBQ [Traumatic Brain Injury Disability Benefits Questionnaire]. The Board has no authority to correct non-Army records, to include VA records. The Board noted the significant amount of medical documentation accumulated over several years and found the applicant has not demonstrated by a preponderance of evidence an error or injustice with regard to the Army's assessment of the existence or severity of his purported injuries. The Board found the applicant has not demonstrated by a preponderance of evidence that the Army erred in creating (or failing to create) medical records documenting his medical conditions, injuries, or treatment thereof.

c. Counsel contends the applicant's TBI, mental health conditions, GERD, and radiculopathy of all extremities should have been found unfitting and warrant a higher (100 percent) medical disability retirement. The Board

determined a greater weight of the evidence reflects none of these conditions were unfitting at the time of the 2010 REFRAD or at the time of disability separation processing in 2015. The Board noted the applicant has had numerous reviews of his medical conditions and of his disability evaluation processing. While one significant correction resulted from those reviews (i.e., the correction that led to a higher rating of 70%), the Board determined the applicant has not demonstrated by a preponderance of evidence that additional corrections or amendments of the outcome of his disability evaluation are warranted. The Board considered counsel's rebuttals to the advisory opinions and the medical advisory from Dr. B_, but found a preponderance of the evidence supports the final corrected outcome of the applicant's PEB that he would be medically retired with a 70% disability rating. The Board found the [2017 and 2020] ARBA and [2018] MEB advisory opinions to be persuasive evidence that the applicant's medical and behavioral health conditions were fully considered and assessed both at the time of the 2010 REFRAD and during the later disability separation processing.

d. Regarding the applicant's request for a records correction to show additional injuries he sustained during the 2009 MRAP accident were incurred ILD, the evidence reflects a LOD determination was completed in 2013 pertaining to injuries the applicant sustained when he fell from an MRAP in 2009 while serving in Iraq. His injuries included disc degeneration NOS [not otherwise specified] and a back injury. These injuries were determined to have been incurred ILD. Counsel contends a head injury should also have been found ILD. The Board found the applicant has failed to demonstrate by a preponderance of the evidence a head injury or TBI was incurred as a result of the 2009 MRAP accident. As noted by the [2017 and 2020] ARBA medical advisory opinions, an October 2009 concussion screening reflects the applicant denied experiencing any event during his deployment that may have caused a concussion. The July 2020 ARBA medical advisory opinion notes that the applicant's complaints [are] suggestive of a TBI [which] preceded the September 2009 MRAP event (i.e., were not a result of the accident). While the applicant reported a head injury while falling out of a vehicle during his April 2010 administrative separation examination, in [sic] 20 September 2011, as noted in the [2018] MEB and [2017 and 2020] ARBA medical advisory opinions, the applicant denied any instances of head trauma prior to or since returning from deployment. The Board found the denial of previous head trauma / TBI by the applicant directly following deployment more persuasive than the more recent assertions that he experienced a TBI during the 2009 event. As such, the Board found the applicant has failed to demonstrate by a preponderance of evidence that a correction of the LOD determination regarding the 2009 MRAP is warranted.

e. Regarding whether or not the injuries the applicant incurred in an accident on 6 August 2014 required a LOD finding, the Board gave greater

weight to applicant's commander's confirmation that the applicant was not entitled to basic pay on 6 August 2014 and that he was not traveling directly to IDT [inactive duty training] at the time of the motor vehicle accident as required by Title 10, U.S.C., section 1204(2)(ii) or AR 600-8-4. There were two intervening nights between the accident and the start of IDT. The Board found the greater weight of the evidence reflects that, while the ultimate terminus of the applicant's multi-day journey was IDT, the intended endpoint of his travel on 6 August 2014 was not IDT, but rather a stopover point during his journey. As such, the Board determined a preponderance of evidence did not support a finding that the applicant was "traveling directly" to IDT at the time of the 6 August 2014 accident. The Board agreed with the unit's determination that there was no basis for a LOD investigation and found a preponderance of evidence did not support a recommendation to change the previous decisions made on this matter or direct a LOD determination regarding the 6 August 2014 motor vehicle accident.

(alterations added; surname redacted in original).

After the decision of the 2021 ABCMR was filed with the court, on August 2, 2021 the defendant filed another unopposed motion to "remand this case, in part, to the National Guard Bureau (NGB or agency), for 45 days to determine whether a line of duty investigation should be conducted concerning an August 6, 2014 motorcycle accident which Mr. Martin alleges caused and exacerbated certain medical conditions of his." The same day, August 2, 2021, the parties also filed a motion to stay proceedings. After consideration, the court granted the motion for remand and the motion to stay in an August 18, 2021 Order which instructed the National Guard Bureau to

consider Mr. Martin's line of duty claim. The National Guard Bureau may address any other issues within its authority, including any other pertinent issues raised by the parties. After a decision by the National Guard Bureau, the National Guard Bureau shall allow plaintiff an opportunity to respond to the decision.

In a joint status report filed on May 5, 2022, the parties informed the court of the conclusions reached by the National Guard Bureau as follows:

On May 4, 2022, NGB determined that Mr. Martin's 2014 accident occurred in the line of duty and issued its decision to that effect. That decision, issued yesterday, is currently en route to Mr. Martin, and has just been delivered electronically to Mr. Martin's counsel today. This case was remanded to NGB to answer two questions: 1) whether a line of duty (LOD) investigation should have been conducted for Mr. Martin's 2014 motorcycle accident, and 2) what the result of any such investigation would be if it were necessary. Those questions have now been answered, with NGB concluding that an LOD was required and subsequently finding Mr. Martin in the line of duty for the 2014 accident. As such, the parties do not request any further extension of the remand period.

Having just received NGB's decision, Mr. Martin requires time to review the decision and determine a further course of action. Because the [2021] decision of the Army Board for Correction of Military Records (ABCMR) at issue in this case is premised on a finding that Mr. Martin's 2014 accident is not in the line of duty, Mr. Martin anticipates filing a request to this Court to remand the case to the ABCMR for further proceedings in light of NGB's decision. Counsel for Mr. Martin will draft and file a motion to remand this case to the ABCMR once his review of the NGB decision is complete.

(alteration added; emphasis in original).

Given the determination of the National Guard Bureau that the motorcycle accident had occurred in the line of duty, the parties filed a January 27, 2023 joint status report indicating "that the case is ready for remand to the Army to determine the impact of the Army's recent line of duty determination made with regard to Mr. Martin's 2014 motorcycle accident." Thereafter, on February 8, 2023, the court again issued an Order staying and remanding the case to the ABCMR "to consider the impact of the Army's recent line of duty determination made with regard to Mr. Martin's 2014 motorcycle accident."

In a September 29, 2023 decision, the 2023 ABCMR described the process it had employed to reach a decision during the most recent remand and noted Mr. Martin provided more than 9,000 pages of records. The 2023 ABCMR explained that it had reviewed the documents provided, including:

a. Second Remand Proceedings[12] which contains (Tabs 1-9) ABCMR ROP [record of proceedings], decision letter, and denial memo 2021, response to 28 July 2020 Medical Advisory Opinion (17 July 2019), VA Medical Record, 21 March 2014, email from counsel to ARBA requesting 30-day extension to provide response to Medical Advisory Opinion 29 July 2020, ARBA memo allowing 30 days to respond to Medical Advisory Opinion, 29 July 2020, Medical Advisory Opinion from Medical Advisor to ARBA, 28 July 2020, response brief and exhibits on remand to 30 August 2018 decision, and US Court of Federal Claims Order remanding Case 16-1221 to ABCMR and staying proceedings, 6 December 2018.

b. First Remand Proceedings which contains (Tabs 10-20) ABCMR Determination/Recommendation, 30 August 2018, board vote, ABCMR ROP, 30 August 2018, response to 22 March 2018 Medical Advisory Opinion, 21 May 2018, Medical Advisory Opinion from IDES, Fort Bragg

---

12. The court first remanded the case to the ABCMR in 2017, which issued a decision in 2018, the plaintiff sought reconsideration of the ABCMR's decision in 2018. The ABCMR issued a decision on reconsideration in 2021. In 2021, the court remanded the case to the National Guard Bureau, which issued a decision in 2022, and finally the court remanded the case again to the ABCMR in 2023, which issued the most recent remand decision in September 2023.

OTSG, 22 March 2018, Medical Advisory Opinion from CMD, ARBA, 14 August 2017, U.S. Court of Federal Claims Order enlarging remand of Case 16-1221, 4 August 2017, request for relief from PEB findings, with attachments, 4 August 2017, letter from U.S. Court of Federal Claims to Deputy Assistant Secretary ABCMR ref. Court Order remanding Case 16-1221 for further processing, 14 February 2017, Remand Order, 13 February 2017, and additional medical records reviewed by ABCMR from USAPDA.

c. Documents from the USAPDA including DA Form 199-2 USAPDA Revised PEB, 15 December 2015, memorandum from USAPDA ref. nonconcurrence/rebuttal to PEB findings, Order D 349-28, 15 December 2015, Army National Guard Retirement Points History Statement, 8 December 2015, USAPDA memo Ref. Appeal of PEB proceedings, 3 December 2015, email from USAPDA approving extension to submit appeal, 20 October 2015, brief and support docs to PEB, 20 October 2015, PEB letter of instruction for formal PEB proceedings, 7 October 2015, DA Form 199-1, Formal PEB proceedings, 7 October 2015, second contingent to PEB, 1 October 2015, MEB return to PEB memo, 31 July 2015, PEB Reconsideration memo, 5 June 2015, memo regarding recess of Formal PEB proceedings and allied documents, 13 May 2015, DA Form 2823 Sworn Statement (Applicant), 12 May 2015, first contingent to PEB, 12 May 2015, formal board notification PEB, 16 April 2015, letter from C.N.B., M.D. to SSA ref SSA opinion, 26 March 2015, fax memo from C.N.B., M.D. to Secretary Veterans Administration, 26 March 2015, fax from C.N.B., M.D. to LTGEN H., 20 March 2015, Laurel Diagnostic Imaging, MRI of Brain without contrast, 10 March 2015, memo from PEBLO, failure to elect, 10 March 2015, DA Form 199, Informal PEB Proceedings, 7 January 2015, health eVet records (349 pages), 18 December 2014, medical records from Choice Medical Center (33 pages), 10 December 2014, driver report of traffic crash, 6 August 2014, appeal of MEB reply, 19 May 2014, request for review of the VA MEB narrative summary by an independent doctor, Dr. C.N.B., (27 pages) 25 April 2014, MEB proceedings, 28 March 2014, VA C&P [compensation and pension exam] General Medical, 20 March 2014, VA C&P Multiple Exam (Intestinal Conditions), 6 March 2014, VA C&P Spine, DBQ [disability benefits questionnaire], 6 March 2014, VA C&P Multiple Exam (Elbow and Forearm Conditions), 6 March 2014, VA C&P DBQ (Elbow and Forearm Conditions), 6 March 2014, VA C&P (Shoulder, Elbow, Wrist, Hip, Knee, Ankle) Consultation notes, 5 March 2014, VA C&P PTSD, Initial Evaluation, 4 March 2014, VA C&P Spine, 28 February 2014, VA C&P Examination Scars/Disfigurement, 26 February 2014, VA C&P Multiple Exams Ear Conditions, 25 February 2014, eDES MDCO Patient Demographics, 18 December 2013, DA Form 3349 (Physical Profile), 6 December 2013, LES email, 1 October 2013, DA Form 2173 (Line of Duty Determination), 31 May 2013, DA Form 7652 (Physical Disability Evaluation System (PDES) Commander's Performance and Functional Statement, 21 March 2013, DD Form 214 (Certificate of Release or Discharge from Active

Duty), 9 November 2010, and Military Orders, Retained on Active Duty, 20 November 2009 and 29 October 2009.

      d. Medical Records from DVA (Various dates) (Pages 1771-8612) 6,841 pages.

      e. Armed Forces Health Longitudinal Technology Application (AHLTA) Military Electronic Health Records (Various dates) (Pages 8613-9678) 1,065 pages.

      f. AMHRR [Army Military Human Resource Record] (Pages 9679-9833) 154 pages.

      g. LOD determination for 6 August 2014 Motorcycle Accident, 24 September 2015.

(footnote and alterations added).

The 2023 ABCMR highlighted three documents in particular: the 2023 Army Review Boards Agency medical advisory opinion, the behavioral health addendum to the 2023 Army Review Boards Agency medical advisory opinion, and plaintiff's counsel's response to the 2023 Army Review Boards Agency medical advisory opinion and its addendum. In its 2023 medical advisory opinion, the Army Review Boards Agency, discussing the effects of the 2022 National Guard Bureau decision on the 2023 remand, stated:

      h. USAPDA concurred with the formal physical evaluation board's findings the applicant had three service incurred disabilities which were unfitting for continued military service: "Degenerative disc disease lumbar spine," "Degenerative disc disease cervical spine," and "Right upper extremity radiculopathy." However, they nonconcurred with the formal physical evaluation board's determination that his cervical spine condition and right upper extremity radiculopathy were not incurred in the line of duty and thus not compensable.

      i. USAPDA, having determined these two additional disabilities were compensable, applied the VA derived ratings of 30% and 30% respectively and when combined with his lumbar spine condition previously rated at 40%, they recommended the applicant be permanently retired for physical disability with a combined military disability rating of 70% (40% combined with 30% = 58% combined with 30% = 71% which rounds to 70%).

      j. The Report of Investigation Line of Duty and Misconduct (DD Form 261) referenced by the Court shows that on 4 May 2022 the Army National Guard Bureau found the applicant's motorcycle incurred injuries of "Cervical Radiculopathy, Cervicothoracic Spondylosis with Radiculopathy and

Lumbar Intervertebral Disc Degenerations" had been "IN LINE OF DUTY - EXISTED PRIOR TO SERVICE - SERVICE AGGRAVATION."

k. These are the same three medical conditions which USAPDA had determined to have been incurred in the line of duty and compensable. Orders published by USAPDA on 15 December 2015 show the applicant was to be placed on the retirement list with a 70% disability rating effective 19 January 2016.

l. It is the opinion of the ARBA medical advisor that the 4 May 2022 line of duty determination made by the Army has no effect on the compensation the applicant was granted and began to receive on 19 January 2016.

(capitalization in original). The behavioral health addendum, discussing TBI, explained:

b. A review of the records showed that while on active duty the applicant was diagnosed with Adjustment Disorder and Occupational Problems. Upon discharge from active duty, he was found to medical meet [sic] retention standards per AR 40-501, Chapter 3 and did not have a diagnosis that warranted separation through military medical channels. While serving in the National Guard the applicant underwent a VA C&P Examination (Initial PTSD Disability Benefits Questionnaire) on 21 March 2014 and was found to not meet diagnostic criteria for PTSD but did meet diagnostic criteria for Unspecified Trauma Related Disorder. The examiner also noted a history of TBI.

c. Prior to the applicant's C&P Examination, he was referred to the Integrated Disability Evaluation System on 30 January 2013 for "Lumbar DDD" (degenerative disc disease). The MEB subsequently determined the applicant to have two conditions which failed the medical retention standards of AR 40-501: "Degenerative disc and joint disease lumbar spine" and "Degenerative disc and joint disease cervical spine." The applicant was not found to have an unfitting behavioral health condition.

d. On 14 May 2014, the applicant requested reconsideration of the MEB decision and indicated he did not agree with the MEB's findings and recommendation. He contended that his diagnoses of Unspecified Trauma Related Disorder and TBI should be found to fail medical retention standards. A review of the records by this advisor found no evidence to indicate the applicant failed medical retention standards for either TBI or Unspecified Trauma Disorder. Records showed the applicant [sic] PULHES score for psychiatry reflected "1" and there was no evidence that demonstrated Medical Retention Determination Point (MRDP) was met for either diagnosis.

e. Following an informal physical evaluation board, a request for reconsideration, a formal physical evaluation board, and a VA reconsideration of his disability ratings, the United States Army Physical Disability Agency (USAPDA) itself made the final decisions on 15 December 2015. The agency found that the applicant's diagnoses of TBI and unspecified trauma related disorders were not unfitting.

(capitalization in original; alterations added). Finally, the 2023 ABCMR noted that plaintiff's counsel's reply to the medical advisory opinion and addendum included five exhibits for the 2023 ABCMR to review:

• VA Case Summary letter, 23 June 2023
• Board of Veterans' Appeals decision, 20 July 2022
• partial PTSD and spine DBQs
• partial headache DBQ
• VA disability rating code sheet and decision, 25 November 2014[.]

(alteration added).

In the discussion section of its decision, the 2023 ABCMR explained:

1. After reviewing the application, all supporting documents, and the evidence found within the military record, the Board found that relief was not warranted. The Board carefully considered counsel's contentions, including those raised during the course of the applicant's appeals in the Disability Evaluation System and all three remands, the service records, the medical records, and the advisory opinions obtained in connection with the previous cases as well as the current case.

2. The United States Court of Federal Claims remanded this case to consider the impact of the Army's recent line of duty (LOD) determination regarding a 2014 motorcycle accident on the applicant's final disposition. The Board first notes that the applicant was medically retired in 2016 for three unfitting conditions that caused or contributed to the termination of his career: degenerative disc disease lumbar spine, degenerative disc disease cervical spine, and right upper extremity radiculopathy. All three conditions were determined to be incurred in the line of duty and were compensable.

3. The applicant's 2014 motorcycle accident occurred during the processing of his case through the Disability Evaluation System. The LOD determination issued in 2022 stated the motorcycle accident resulted in cervical disc degeneration causing stenosis and radiculopathy, thoracic disc degeneration causing stenosis, and lumbar disc degeneration causing stenosis and radiculopathy.

4. The Board compared the medical conditions listed on the LOD with the conditions already deemed unfitting and noted that they are similar. Next the Board reviewed the record to determine whether additional medical

conditions should be added as unfitting. The Board first considered the treatment records from the period after the accident. The applicant received medical treatment primarily for a cervical injury with cervical radiculopathy in the right upper extremity documented on an EMG [electromyograph]. The records also noted complaints of mid and low back pain with intermittent numbness and tingling in his legs and nonspecific leg pain. An EMG of the right lower extremity was normal.

5. Multiple ARBA medical advisers have considered this case. The Board found two advisory opinions in particular to be compelling. The Board first considered the advisory opinion obtained in connection with the current remand, dated 7 July 2023. The ARBA medical advisor opined that the LOD conditions were already included in the compensable conditions and the LOD determination had no effect on the compensation the applicant was granted and began receiving in 2016. For a more detailed consideration of the medical conditions at issue, the Board turned to the advisory opinion provided in the previous remand, dated 28 July 2020. The medical advisor summarized the pre- and post-accident medical records and opined that the weight of the evidence did not support a finding that radiculopathy (in extremities other than the right upper extremity) was unfitting at the time of military discharge. The medical advisor stated that the applicant's medical conditions were fully and appropriately assessed, and the medical evidence did not support a change in the disability determination in this case. The Board found these opinions persuasive in combination with the contemporaneous medical records.

6. The Board also considered arguments by counsel and notes that counsel repeatedly confuses the Army rules of medical unfitness with the VA regulations about service connection. Rather than focusing on the conditions in the LOD, counsel lists all the applicant's VA rated medical conditions (and some that do not even have ratings yet) and contends they make the applicant unfit. The Board addressed these conditions at length in its previous decision.

7. The Board determined that a preponderance of the evidence shows the LOD determination does not change the applicant's medical retirement disposition. The applicant's medical conditions have been thoroughly evaluated and he has had the opportunity to participate, through counsel, throughout this lengthy process. The applicant did not sustain his burden of proving that an error or injustice occurred. The Board denies relief.

(alterations added).

After the 2023 ABCMR, the parties filed cross-motions for judgment on the Administrative Record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC) in this court. The Administrative Record in this case spans thousands of pages and includes the original Administrative Record, filed on June 1, 2021, a first supplement to the original Administrative Record, filed on August 1, 2022, a second supplement to the original Administrative Record, filed on January 27, 2023, and

a Supplemental Administrative Record, filed on November 14, 2023 pursuant to the court's November 7, 2023 Order that the parties file a "comprehensive" Administrative Record before filing their cross-motions for judgment on the Administrative Record, given the number of remands, reconsideration, appeals and various decisions in the case.[13]

Plaintiff's briefs with the court regarding the current cross-motions for judgment on the Administrative Record allege five principal arguments: (1) that defendant ignored, and inappropriately considered, records pertaining to his TBI/mental health claims; (2) that defendant ignored, and inappropriately considered, records pertaining to his claim of radiculopathy of all extremities; (3) that defendant ignored, and inappropriately considered, records pertaining to his claims regarding gastrointestinal conditions; (4) that defendant failed to consider the combined effect of his conditions; and (5) that defendant improperly considered the exacerbating effect of the 2014 motorcycle accident in light of

---

[13] In reviewing all the documents which comprise the Administrative Record in the above-captioned case, the court discovered an apparent gap in Bates page numbers of approximately 6,000 pages. This gap appears in the Bates numbering between the final page of the second supplement to the original Administrative Record and the first page of the supplemental Administrative Record. At oral argument, the court asked the parties to address how this gap occurred and if it meant that the court was missing documents which could impact its analysis of the issues presented. The parties admitted that they were aware of the gap, but could not explain it to the court, so the court ordered supplemental briefing from the parties as to the missing pages. In their joint response to this Order, the parties explained that:

> After the Court issued its July 24 order, defendant's counsel conferred with Army counsel and support staff, as well as Department of Justice support staff involved in the preparation of the administrative record. Unfortunately, the individual in the Army who created the supplement filed on November 14, 2023, which began with AR 18998, left his position with Army Litigation Division, and was unable to be reached. As a result, the Government has no additional information suggesting whether the gap in the bates numbering of the administrative record was possibly due to pages being omitted from the record or, more likely, because of an inadvertent mis-numbering of the supplement that was filed on November 14, 2023.

> Nonetheless, the parties have conferred and agree that no documents are missing from the administrative record. The parties discussed the contents of the administrative record each time before the record was filed, and each time the parties agreed on the contents of the administrative record. The parties also agree that the gap in the bates numbering of the administrative record has no impact on the case or the parties' cross-motions for judgment on the administrative record.

(internal references omitted).

the 2022 National Guard Bureau decision that that accident had occurred in the line of duty.

Defendant filed a response to plaintiff's motion for judgment on the Administrative Record and a cross-motion in response to plaintiff's motion for judgment on the Administrative Record, arguing that the

administrative record shows that the ABCMR reviewed Mr. Martin's documented medical conditions at each stage of the Disability Evaluation System (DES), to include a Medical Evaluation Board (MEB), an informal physical evaluation board (IPEB), a formal physical evaluation board (FPEB), and a final appeal to the USAPDA, as well as three separate medical advisory opinions. These reviews have repeatedly found that te [sic] three conditions Mr. Martin argues failed to meet Army retention standards, were to the contrary, determined to be not unfitting. Thus, the ABCMR's decision to deny additional medical retirement benefits, which would have increased Mr. Martin's disability rating from 70% to 75%, was not arbitrary or capricious, was supported by substantial evidence, and was not contrary to law.

(alteration added). The cross-motions for judgment on the Administrative Record were fully briefed and oral argument was held.

## DISCUSSION

As indicated above, the parties have cross-moved for judgment on the Administrative Record. RCFC 52.1(c)(1) governs motions for judgment on the Administrative Record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record.'" Harmonia Holdings Grp., LLC v. United States, 20 F.4th 759, 766 (Fed. Cir. 2021) (quoting XOtech, LLC v. United States, 950 F.3d 1376, 1379–80 (Fed. Cir. 2020)); see also Stahl v. United States, 167 Fed. Cl. 657, 680 (2023); Henrikson v. United States, 162 Fed. Cl. 594, 607 (2022); Raj v. United States, 158 Fed. Cl. 569, 571 (2022); Valles-Prieto v. United States, 159 Fed. Cl. 611, 616 (2022) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006)); Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. 681, 691 (2020) (citing DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010)); AAR Manufacturing, Inc. v. United States, 149 Fed. Cl. 514, 522 (2020); Glocoms, Inc. v. United States, 149 Fed. Cl. 725, 731 (2020); Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005)); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126 at 131). The process is "designed to provide for trial on a paper record, allowing fact-finding by the trial court." Bannum, Inc. v. United States, 404 F.3d at 1356; see also Raj v. United States, 158 Fed. Cl. at 571; Vectrus Sys. Corp. v. United States, 154 Fed. Cl. 29, 40 (2021); Jordan Pond Col, LLC v. United States, 115 Fed. Cl. 623, 630 (2014).

The court reviews the September 29, 2023 ABCMR decision as to whether the decision was arbitrary, capricious, unsupported by substantial evidence, or contrary to law. See Chappell v. Wallace, 462 U.S. 296, 303 (1983) ("Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious or not based on substantial evidence"). The Court of Appeals for the Federal Circuit has written, "we will not disturb the decision of the Board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." Prestonback v. United States, 965 F.3d 1363, 1368 (Fed. Cir. 2020) (citing Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005) (citing Haselrig v. United States, 333 F.3d 1354, 1355 (Fed. Cir. 2003))); see also Doyon v. United States, 58 F.4th 1235, 1242 (Fed. Cir. 2023) ("[A] court may only set aside the BCNR's [Board for Correction of Naval Records] decision if it was 'arbitrary or capricious, unsupported by substantial evidence, or otherwise not in accordance with law'" (alterations added) (quoting Fisher v. United States, 402 F.3d 1167, 1180 (Fed. Cir. 2005))); Baude v. United States, 955 F.3d 1290, 1298 (Fed. Cir. 2020); Barnick v. United States, 591 F.3d 1372, 1377 (Fed. Cir. 2010); Lewis v. United States, 458 F.3d 1372, 1376 (Fed. Cir. 2006) (citing Martinez v. United States, 333 F.3d 1295, 1314 (Fed. Cir. 2003)), reh'g en banc denied (Fed. Cir. 2006), cert. denied, 552 U.S. 810 (2007) (stating that this court reviews the AFBCMR decision "to determine whether it is arbitrary, capricious, unsupported by substantial evidence, or contrary to law"); Metz v. United States, 466 F.3d 991, 998 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006); Porter v. United States, 163 F.3d 1304, 1312 (Fed. Cir. 1998), reh'g denied, en banc suggestion declined (Fed. Cir.), cert. denied, 528 U.S. 809 (1999); Heisig v. United States, 719 F.2d at 1156; Skinner v. United States, 219 Ct. Cl. 322, 332, 594 F.2d 824, 830 (1979); Henrikson v. United States, 162 Fed. Cl. at 607 ("As noted, the scope of review of the decision of a military correction board is a narrow and deferential one. The Court is '"limited to determining whether a decision of the Correction Board is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations."'" (quoting Melendez Camilo v. United States, 642 F.3d 1040, 1044 (Fed. Cir. 2011) (quoting Heisig v. United States, 719 F.2d at 1156))); Osburn v. United States, 171 Fed. Cl. 38, 44 (2024); Okuda v. United States, 160 Fed. Cl. 549, 559 (2022); Ward v. United States, 133 Fed. Cl. 418, 427 (2017); Joslyn v. United States, 110 Fed. Cl. 372, 389 (2013); Meidl v. United States, 108 Fed. Cl. 570, 575 (2013). This standard of review is narrow. "The court does not sit as a 'super correction board.'" King v. United States, 149 Fed. Cl. 272, 275 (2020) (quoting Skinner v. United States, 219 Ct. Cl. at 331, 594 F.2d at 829). Moreover, "military administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs." Dodson v. United States, 988 F.2d 1199, 1204 (Fed. Cir. 1993) (citing Arens v. United States, 969 F.2d 1034, 1037 (Fed. Cir. 1992) (citing Sanders v. United States, 219 Ct. Cl. 285, 302, 594 F.2d 804 (1979) (citing Brenner v. United States, 202 Ct. Cl. 678, 686 (1973), cert. denied, 419 U.S. 831 (1974) (discussing judicial deference to military decisions regarding promotions)))); Stahl v. United States, 167 Fed. Cl. at 674.

In Verbeck v. United States, a Judge of this court stated:

> The court's review in these matters is thus limited in scope and deferential in nature. Ms. Verbeck must show that the Board's decision was arbitrary and capricious, contrary to law, or unsupported by substantial evidence. See Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005)[, cert. denied, 546 U.S. 1066 (2005)]; Godwin v. United States, 338 F.3d 1374, 1378 (Fed. Cir. 2003); Heisig [v. United States], 719 F.2d at 1156 . . . . The Board's decision will comply with the substantial evidence standard so long as a "'reasonable mind might accept' [the] particular evidentiary record as 'adequate to support [the contested] conclusion.'" Dickinson v. Zurko, 527 U.S. 150, 162 (1999) (quoting Consolidated Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)). Similarly, the arbitrary and capricious standard "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000)[, reh'g denied (Fed. Cir. 2000)].
>
> In sum, the court must satisfy itself that the Board considered all of the relevant evidence and provided a reasoned opinion that reflects a contemplation of the facts and circumstances pertinent to the case before it. See Heisig [v. United States], 719 F.2d at 1157 ("Under the substantial evidence rule, all of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion."); Van Cleave v. United States, 70 Fed. Cl. 674, 678–79 (2006) (While the court does not "serve as a 'super correction board[,]' Skinner v. United States, . . . correction boards must examine relevant data and articulate satisfactory explanations for their decisions.") (citations omitted). If the Board "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the [Board], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]" its decision runs afoul of even this lenient standard of review. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Verbeck v. United States, 97 Fed. Cl. 443, 451 (2011) (alterations added; emphasis and omissions in original); see also Stahl v. United States, 167 Fed. Cl. at 667–68. As a Judge of this court in Osburn v. United States, when reviewing a Board for Correction of Military Records decision, stated that the "Board is not required to detail its assessment of every piece of evidence in the record, nor resemble 'a model of analytic precision to survive a challenge.'" Osburn v. United States, 171 Fed. Cl. at 45 (quoting Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995)). "For the motion for judgment on the administrative record, plaintiff bears the burden to prove through the administrative record the Board's decision was arbitrary and capricious, contrary to law, or unsupported by substantial evidence." Stahl v. United States, 167 Fed. Cl. at 673 (citing Chambers v. United States, 417 F.3d at 1227); see also Arens v. United States, 969 F.2d at 1037.

The decision of the 2023 ABCMR indicates that it considered "the application, all supporting documents, and the evidence found within the military record." The 2023 ABCMR further indicated that the record before the 2023 ABCMR included the decision of the 2021 ABCMR, the decision of the 2018 ABCMR, the 2022 National Guard Bureau decision, and the medical advisory opinions from 2017, 2018, 2020, and 2023. A Judge of this court instructed that the scope of review available to the ABCMR on remand is wide. See Meidl v. United States, 114 Fed. Cl. 607, 609-10 (2014); see also 10 U.S.C. § 1552(a) (2024) ("The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice. Except as provided in paragraph (2), such corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department."); Pipes v. United States, 123 F.4th 1324, 1326 n.1 (Fed. Cir. 2024); LaBonte v. United States, 43 F.4th 1357, 1365 (Fed. Cir. 2022) (quoting 10 U.S.C. § 1552(a)).[14] In Meidl v. United States, a plaintiff received a number of Officer Evaluation Reports (OERs) indicating that he demonstrated "[e]xceptionally outstanding performance," but also that "his permanent [physical] profile prevents him from deploying, performing the APFT [Army Physical Fitness Test] and weapons qualification." Meidl v. United States, 114 Fed. Cl. at 609-10 (last alteration added; internal quotation marks omitted). When the Meidl plaintiff was discharged from active duty with disability severance pay, but not medical retirement pay, he filed suit in United States Court of Federal Claims. The United States Court of Federal Claims Judge in Meidl remanded the case to the ABCMR, and when the ABCMR "denied Plaintiff's request for relief," the Judge in Meidl remanded the case again, and again the ABCMR denied relief. See id. at 611. After the second remand, the Meidl plaintiff argued that the decision of the ABCMR on the second remand was wrong because "the ABCMR's reliance on the OERs is 'erroneous,' because the OERs do not address any of Plaintiff's specific physical disabilities and are 'irrelevant to the question of which conditions are unfitting.'" Id. at 614 (citation omitted). Nevertheless, the Judge in Meidl upheld the findings of the ABCMR on the second remand, stating:

> neither the PEB nor the ABCMR relied solely on Plaintiff's OERs to justify the fitness determinations as to his shoulder, wrist, and bilateral foot conditions. Instead, the PEB (and by implication the ABCMR) relied on, inter alia, Plaintiff's surgical history, difficulty lifting objects over five pounds, X-rays showing degenerative changes in the scapholunate joint, and

---

[14] The court notes, however, that another Judge of this court also noted:

> As the Court of Claims explained decades ago, military correction boards "were established for the purpose only of reviewing, on application of the military personnel, a military record to correct errors or injustices against such personnel and not to review and reverse decisions of other established boards favorable to such personnel." Friedman v. United States, 141 Ct. Cl. 239, 251–52, 158 F. Supp. 364 (1958) (emphasis added).

Lyon v. United States, 161 Fed. Cl. 88, 101 (2022) (emphasis in original).

> functional loss limitations, as evidence that his shoulder and wrist conditions were unfitting. That same evidence, however, did not address Plaintiff's bilateral foot conditions. Therefore, the PEB (and the ABCMR by implication) relied on Plaintiff's November 2009 orthopedic consult, Plaintiff's passage of the APFT as late as April 2008, despite suffering from pes planus since "at least 2002," "minimal analgesic use on an occasional basis," and his "outstanding" OERs through 2009 as evidence that his bilateral foot conditions were not unfitting. In other words, the ABCMR did not differentiate between Plaintiff's conditions exclusively on the basis of his OERs.

<u>Meidl v. United States</u>, 114 Fed. Cl. at 618 (internal citations omitted). Thus, even a broad range of documents have been held appropriate for the ABCMR to consider on remand, so long as it does not reach its decision "exclusively on the basis" of less relevant documents.

As stated above, plaintiff's current motion for judgment on the Administrative Record makes five arguments for this court to consider: (1) that defendant ignored, and inappropriately considered, records pertaining to his TBI/mental health claims; (2) that defendant ignored, and inappropriately considered, records pertaining to his claim of radiculopathy of all extremities; (3) that defendant ignored, and inappropriately considered, records pertaining to his claims regarding gastrointestinal conditions; (4) that defendant failed to consider the combined effect of his conditions; and (5) that defendant improperly considered (or failed to consider) the exacerbating effect of the 2014 motorcycle accident in light of the 2022 National Guard Bureau decision that that accident had occurred in the line of duty.

In plaintiff's motion for judgment on the Administrative Record, plaintiff focuses on three conditions, "TBI/Mental Health," "Radiculopathy of all extremities," and "Gastrointestinal Conditions." At oral argument on the parties' cross-motions for judgment on the Administrative Record, plaintiff's counsel of record indicated his belief that "my best argument for the 5 percent [increase in disability rating] at this point is the TBI."[15] (alteration added). Without altering its position that plaintiff should not be entitled to further compensation due to TBI, defendant agreed with plaintiff's assertion that TBI is his strongest argument, agreeing that "TBI certainly has to be something that I – you know, if I were Mr. Martin, I'd be looking at," and "I would probably be pretty focused on that one."

---

[15] In a footnote to plaintiff's motion for judgment on the Administrative Record, plaintiff included a longer list of conditions which he claimed the 2023 ABCMR had ignored or insufficiently considered. The court notes that plaintiff did not brief these conditions or explain how they relate to the three main arguments in plaintiff's motion for judgment on the Administrative Record. Defendant, therefore, argues that these footnoted conditions were not "put into issue at the" 2023 ABCMR either.

Plaintiff's first principal arguments in his motion for judgment on the Administrative Record in support of his claim for increased disability compensation for "TBI/Mental Health" are:

the [2023] ABCMR, along with [2020] ARBA and MEB [2014 Medical Evaluation Board], failed to consider the entirety of Mr. Martin's medical history regarding his traumatic brain injury. The 2020 medical advisory opinion ("MAO") by ARBA did not account for key symptomologies and disregarded symptoms without considering possible aggravation. Despite a December 2009 diagnosis of a history of TBI, the MAO discounted Mr. Martin's symptoms of dizziness, headaches, and sleep issues simply because they existed prior to the MRAP fall. However, the MAO did not address the possibility that those conditions were aggravated by the service-connected TBI Mr. Martin suffers from, nor did they address the fact that he experienced new symptoms after falling out of the MRAP.

In August 2009, Mr. Martin returned to full duty with no restrictions. Yet, less than a month after the MRAP accident, Mr. Martin experienced an increased difficulty in sleeping that required sleeping pills and increased dizziness, leading to a complete lack of confidence in his balance. Furthermore, despite a negative TBI test three and a half months after the accident, Mr. Martin began displaying symptoms that had not existed prior to the fall, such as being a poor historian, vertigo, rapid speech patterns, and poor eye contact. The ARBA and ABCMR decision is contrary to law and lacks substantial evidence because they fixate on symptoms that existed prior to the MRAP injury (but after his enlistment) without looking at any new or aggravated symptoms the soldier experienced.

Prior to his MRAP injury accident, Mr. Martin had only one singular incident related to any behavioral health concern. Mr. Martin first began to display concerning behavior, which required weekly medical visits in April 2010. Yet, in both the 2020 and 2017 proceedings, the MAO overlooked his total behavioral health issues prior to his REFRAD [release from active duty]. The 2020 MAO states that in April 2010, Mr. Martin developed anxiety and transient suicide ideation from a fear of administrative separation because of a swastika tattoo. This led to his psychiatric admission and resulted in a diagnosis of "Adjustment Disorder with Disturbance of Emotions and Conduct." While narrowing their focus to the adjustment disorder diagnosis, the MAO skirts the fact that Mr. Martin went from a low-risk level and compliant in March 2010 to a moderate/severe risk level until his REFRAD. In fact, neither MAO mentions that in April 2010, Mr. Martin became a severe risk because of mental health issues because he set up surveillance cameras to watch people, stuck socks above the doors, could not be reached by phone, and communicated less in meetings. Therefore, any reliance by the ABCMR on the 2020 MAO constitutes a significant error and should properly concern this court because the MAO was so significantly flawed: Mr. Martin required constant and continual medical

supervision for his TBI/Mental Health, and his behaviors placed the health of other soldiers at risk.

The ABCMR discounted medical evidence showing Mr. Martin suffered from service connected TBI/mental health prior to his REFRAD and his March 2014 MEB. In January 2014, two (2) months before his MEB, the VA diagnosed and established a fifty percent (50%) disability for Mr. Martin related to TBI and a trauma-related disorder. Likewise, Dr. Bash, an independent medical reviewer, diagnosed Mr. Martin with TBI and a mental health condition that made him unfit prior to his REFRAD. While not determinative, these later diagnoses indicate the possibility, which the ABCMR failed to address, that the Army misdiagnosed Mr. Martin at separation.

The ABCMR ultimately discounts Dr. Bash's opinion for the MEB and ARBA medical advisories because it was based on "contemporaneous medical evidence," as Dr. Bash focused on "after-the-fact self-reporting." Yet, Dr. Bash did review Mr. Martin's medical record and conducted an MRI for his TBI and illnesses. Further, Dr. Bash's medical examination fills in the blanks where the military failed to create a medical record based on the facts at the time in question.

(alterations added; citations omitted).

In its cross-motion for judgment on the Administrative Record, defendant responds:

Regarding TBI, the MAO cited records showing that while Mr. Martin had a pre-service history of TBI, he had no significant ongoing symptoms. And while he had symptoms that were suggestive of a TBI (dizziness, headaches, sleep issues), these complaints preceded the September 2009 MRAP fall that Mr. Martin alleges caused a TBI. Most importantly, by December 2009, Mr. Martin's neurologic exam "was completely normal" and "[e]xtensive cognitive testing showed no cognitive residuals," a result inconsistent with a finding of a TBI. Further, repeated detailed cognitive testing in September 2011, showed Mr. Martin scoring a 28 out of 30, on a status exam, where a score of 25 or higher is considered normal. The MAO noted a December 17, 2014 neurology evaluation that reported that Mr. Martin had trouble focusing, but found the report unclear and open to interpretation, because (1) prior exams had indicated no cognitive deficit, and (2) there were no alleged in-service TBI events after September 2009, and (3) because no detailed cognitive exam with objective measures was completed during that visit. The MAO noted that the same was true for later exams by Mr. Martin's private neurologist, Dr. Bash, they did not include objective cognitive testing measures. Lastly, the MAO observed that Mr. Martin had apparently been able to independently navigate by personal vehicle over a great distance to his reserve training weekends, from his home in south Florida, to Mississippi, which further suggested no significant cognitive impairment. As such, the medical advisor reasonably concluded

that the weight of the evidence showed that Mr. Martin was fit for these conditions at the time of his discharge.

(first alteration added; citations omitted).

Plaintiff's reply to defendant's cross-motion raised a new argument related to his "TBI/Mental Health" allegations:

[I]t is important to highlight Military's landmark KURTA memo[16] came out in August 2017. This memo illustrates the importance of how TBI and PTSD were not being recorded correctly and thus miscategorized. The Kurtra [sic] memo gives a greater deference to veterans to show how actions, misconduct, and more, after an event are evidence of a TBI/PTSD, just like Mr. Martin is trying to assert here.

(alterations added). Defendant's reply brief addressed plaintiff's reference to the Kurta memo as follows:

The Kurta Memo found that a more lenient or liberal evidentiary standard is appropriate for mental health-related correction claims. However, that issue is not relevant here because the board is not required to apply liberal considerations when deciding whether an applicant's condition meets Army retention standards. In this case, the question before the Board was not whether Mr. Martin had a TBI, but rather whether Mr. Martin's TBI condition met retention standards. The Kurta Memo does not mandate that once a board makes a finding that an applicant has a mental health condition, that the applicant should automatically be granted a medical retirement or even an automatic finding of unfitness.

The 2023 ABCMR outlined plaintiff's TBI argument as follows:

The [applicant] suffered from TBI related to his time in the middle east. On 26 January 2010, [the applicant] sought a follow-up at a TBI clinic. A "history of TBI" was diagnosed. Treatment records from November 2010 show an exacerbation of mental health, including anxiety and depressed mood, as evidence of exacerbation from service. The records appear void of any TBI-specific exam while he was in service. Dr. C___ B___, a civilian doctor the [applicant] was seeing, submitted a medical opinion on 28 May 2014, stating the [applicant] likely suffers from traumatic brain injury residuals. The [applicant] was assigned a 50% evaluation for TBI because of social impairment, reduced productivity, forgetting directions, chronic sleep

---

[16] An August 25, 2017 memorandum from acting Under Secretary of Defense for Personnel and Readiness A. M. Kurta, addressed to "Secretaries of the military departments" stated that: "Liberal consideration will be given to veterans petitioning for discharge relief when the application for relief is based in whole or in part on matters relating to mental health conditions, including PTSD; TBI; sexual assault; or sexual harassment." A. M. KURTA, MEMORANDUM FOR SECRETARIES OF THE MILITARY DEPARTMENTS, 1, 2 (Aug. 25, 2017) (capitalization altered).

impairments, forgetting recent events, and mental health, among others. The condition continued to worsen when the [applicant] was released from active duty instead of placed on the retirement list. The [applicant's] symptoms at this rating hinder his decision-making, response time, and coordination. Further, it inhibits his ability to understand and accurately carry out orders. This poses serious risks to the [the applicant] and his unit, making him unfit for military service. He should be found unfit for service due to this condition.

(alterations and names redacted in original).

Discussing the 2015 formal PEB, the 2023 ABCMR stated:

Neuropsychological Evaluation on 10 December 2009 did not yield evidence of TBI or related cognitive disorder. There are no psychiatric limitations on any of several DA Form 3349's in the case file. The Soldier's Troop Commander does not recommend retention; there are no comments describing mental impairment on the DA Form 7652 dated 21 March 2013. In his sworn testimony the Soldier testified that he was not subsequently injured while on duty and he provided no evidence of injury incurred while he was entitled to base pay subsequent to his release from Active Duty.

Moreover, relying on the 2023 Army Review Board Agency medical advisory opinion's behavioral health addendum, the 2023 ABCMR determined:

b. A review of the records showed that while on active duty the applicant was diagnosed with Adjustment Disorder and Occupational Problems. Upon discharge from active duty, he was found to medical [sic] meet retention standards per AR 40-501, Chapter 3 and did not have a diagnosis that warranted separation through military medical channels. While serving in the National Guard the applicant underwent a VA C&P Examination (Initial PTSD Disability Benefits Questionnaire) on 21 March 2014 and was found to not meet diagnostic criteria for PTSD but did meet diagnostic criteria for Unspecified Trauma Related Disorder. The examiner also noted a history of TBI.

c. Prior to the applicant's C&P Examination, he was referred to the Integrated Disability Evaluation System on 30 January 2013 for "Lumbar DDD" (degenerative disc disease). The MEB subsequently determined the applicant to have two conditions which failed the medical retention standards of AR 40-501: "Degenerative disc and joint disease lumbar spine" and "Degenerative disc and joint disease cervical spine." The applicant was not found to have an unfitting behavioral health condition.

d. On 14 May 2014, the applicant requested reconsideration of the MEB decision and indicated he did not agree with the MEB's findings and recommendation. He contended that his diagnoses of Unspecified Trauma Related Disorder and TBI should be found to fail medical retention standards. A review of the records by this advisor found no evidence to

indicate the applicant failed medical retention standards for either TBI or Unspecified Trauma Disorder. Records showed the applicant PULHES score for psychiatry reflected "1" and there was no evidence that demonstrated Medical Retention Determination Point (MRDP) was met for either diagnosis.

e. Following an informal physical evaluation board, a request for reconsideration, a formal physical evaluation board, and a VA reconsideration of his disability ratings, the United States Army Physical Disability Agency (USAPDA) itself made the final decisions on 15 December 2015. The agency found that the applicant's diagnoses of TBI and unspecified trauma related disorders were not unfitting.

f. The Report of Investigation Line of Duty and Misconduct (DD Form 261) referenced by the Court shows that on 4 May 2022 the Army National Guard Bureau found the applicant's motorcycle incurred injuries of "Cervical Radiculopathy, Cervicothoracic Spondylosis with Radiculopathy and Lumbar Intervertebral Disc Degenerations" had been "IN LINE OF DUTY - EXISTED PRIOR TO SERVICE-SERVICE AGGRAVATION."

g. These are the same three medical conditions which USAPDA had determined to have been incurred in the line of duty and compensable. Orders published by USAPDA on 15 December 2015 show the applicant was to 70% disability rating effective 19 January 2016.

h. It is the opinion of the ARBA medical advisor that the 4 May 2022 line of duty determination made by the Army has no effect on the compensation the applicant was granted and began to receive on 19 January 2016.

(capitalization in original; alteration added).

Reliance by the 2023 ABCMR on medical records, including 2023 Army Review Board Agency medical advisory opinion's behavioral health addendum, was appropriate and within the wide scope of review consistent with the statute at 10 U.S.C. § 1552(a), the United States Court of Appeals for the Federal Circuit's decision in LaBonte v. United States, 43 F.4th at 1365 and this court's decision in Meidl. In fact, reliance on the medical advisory opinions in this case was more appropriate than was reliance on the officer evaluation reports in the Meidl case because the Meidl documents under review were allegedly "irrelevant" and reliance on the medical advisory opinions was permitted only insofar as that they were not the sole source of the ABCMR's decision. In this case, the medical advisory opinions used to reach a decision are directly related to the issues raised in plaintiff's case and the 2023 ABCMR also considered other documents in addition, including thousands of pages of records.

Therefore, when considering plaintiff's "TBI/Mental Health" allegations, the 2023 ABCMR considered plaintiff's arguments, and additional records, such as those from the 2015 formal PEB, the medical advisory opinions, the decisions of the 2018 ABCMR and

the 2021 ABCMR, as well as the National Guard Bureau decision that plaintiff's motorcycle accident had occurred in the line of duty. Upon consideration of these numerous sources, the 2023 ABCMR determined that plaintiff is not entitled to additional relief for "TBI/Mental Health" conditions. The 2023 ABCMR's decision, therefore, was based on a review of the numerous documents, submitted by both parties, as well as consideration of the 2022 line of duty decision. Plaintiff has not met his burden of proving that the 2023 ABCMR's decision relating to the issue of his "TBI/Mental Health" was "arbitrary, capricious or not based on substantial evidence." See Chappell v. Wallace, 462 U.S. at 303. Therefore, this court upholds the decision of the 2023 ABCMR regarding "TBI/Mental Health" raised by plaintiff. See Prestonback v. United States, 965 F.3d at 1368.

Regarding plaintiff's second argument, that defendant ignored documents pertaining to "Radiculopathy of all extremities," plaintiff's motion for judgment on the Administrative Record alleges:

> the [2023] ABCMR based its decision solely on the ARBA MAOs [likely primarily referring to the 2020 and 2023 Army Review Boards Agency medical advisory opinions[17]], which failed to consider relevant substantial medical evidence. . . . [T]he MAO relied on by the ABCMR leaves out relevant evidence from Mr. Martin's time in service. Despite a year's worth of weekly medical records after the fall, the MAO only cites three active-duty medical records. There is no mention of medical reports from within a week of the MRAP fall that indicate right hip and leg pain, which prevents sitting in a vehicle. Similarly, the MAO fails to mention that, in November 2009, the Army diagnosed Mr. Martin with degenerative changes and neuroforaminal stenosis in both the lumbar and cervical regions of his spine. In fact, Mr. Martin continued to report pain until the time of his REFRAD. Given his inability to sit for prolonged periods of time and the likely connection of spine conditions to radiculopathy, Mr. Martin should have been considered unfit per Army regulation 40-501 because of his MRAP fall. As a result, this Court should determine that the ABCMR decision conflicts with the substantial evidence regarding radiculopathy given in the record and thus grant Mr. Martin's motion for judgment on the administrative record.

(alterations, omission, and footnote added; citations omitted).

Defendant responds:

> A December 2, 2009 medical exam stated that Mr. Martin reported "constant posterior neck pain, numbness affecting both upper extremities, back pain, and intermittent numbness/tingling from the pelvis down both legs." This medical exam also showed, however, that Mr. Martin scored 5/5 motor

---

[17] Despite correctly referring to multiple medical advisory opinions on this issue, throughout the rest of plaintiff's argument regarding "Radiculopathy of all extremities," plaintiff refers only to "the MAO," or the medical advisory opinion, in the singular form. The court notes that it is sometimes difficult to determine to which medical advisory opinion plaintiff is referring.

strength for all muscle groups and had good muscle tone in all four extremities. A December 2009 nerve conduction study was within normal limits. A January 15, 2010, exam reported that some of Mr. Martin's symptoms predated the back injury sustained in the MRAP fall, with some numbness being attributed to the insect sting. The therapist noted decreased right upper extremity strength, scoring 4/5.

A January 2011 lumbar MRI showed degenerative disc disease and spondylosis, with mild central canal stenosis and moderate to severe left-sided neuroforaminal stenosis. March 2014 VA back and neck exams diagnosed upper right extremity radiculopathy and indicated moderate right lower extremity radiculopathy, but no left-side radiculopathy at all.

(internal references omitted).

Plaintiff's reply regarding the radiculopathy issue alleges that "[t]he military failed to consider the full record, specifically the medical reports within a week of the MRAP fall, and the years' worth of weekly medical records after the fall." (alteration added). Additionally, plaintiff's reply brief asserts that "the problem with the Defense references to various medical tests and limited discussions of physical exams, e.g., radiculopathy exams, EMG and NCS [nerve conduction study] studies, and physical therapy records recording muscle strength in the extremities is that it is devoid of the Veteran's [Mr. Martin's] complaints of pain." (alteration added).

Defendant's reply, discussing the 2018, 2021, and 2023 ABCMR decisions,[18] as well as the 2020 medical advisory opinion counters:

[T]he board did consider Mr. Martin's full medical records. The MAO also summarized the pre- and post-accident medical records and opined that the weight of the evidence did not support a finding that radiculopathy (in extremities other than the right upper extremity) was unfitting at the time of military discharge.

Mr. Martin next argues that our cross-motion is "devoid of the Veteran's complaints of pain." This argument ignores the extensive medical records reviewed by the board and the MAO, which detail Mr. Martin's subjective symptoms. The MAO and board considered Mr. Martin's subjective symptoms but found the weight of the evidence supported a finding that the radiculopathy condition (in extremities other than the right upper extremity) met medical retention standards.

(alterations added; citations omitted).

Regarding plaintiff's argument that the 2023 ABCMR did not consider sufficient records to arrive at a well-reasoned conclusion on the radiculopathy issue, the court first notes that 2023 ABCMR stated that the "ABCMR Decision letter, 2 April 2021" is one of

---

[18] Defendant collectively refers to the referring to the 2018 ABCMR, 2021 ABCMR, and 2023 ABCMR decisions collectively as "the board," which, at times, is confusing regarding which ABCMR defendant is referring to in defendant's submissions.

the "applicant's supporting document(s) considered by the Board [2023 ABCMR]." (capitalization altered; alteration added). Moreover, plaintiff does not acknowledge the following passage from the 2021 ABCMR decision in which the 2021 ABCMR indicates that it considered both the medical advisory opinions plaintiff contests and the "weekly medical records" he claims it ignored:

> The Board [2021 ABCMR] found the [2017 and 2020] ARBA and [2018] MEB medical advisories [sic] opinions reflecting that the applicant met retention standards at the time of the 2010 REFRAD [release from active duty] to be more persuasive when compared with the medical opinion by Dr. B_ [plaintiff's Independent Medical Expert], because the ARBA and MEB advisory opinions were based upon a review and assessment of the contemporaneous medical evidence, whereas Dr. B_'s assessment appears based almost entirely on the applicant's after-the-fact self-reporting – self-reporting that is often directly contradicted by the contemporaneous medical evidence or other statements by the applicant.

(alterations added; surname redacted in original). Beyond the decision of the 2021 ABCMR, the 2023 ABCMR further relied on the 2020 medical advisory opinion when it stated: "The medical advisor summarized the pre- and post-accident medical records and opined that the weight of the evidence did not support a finding that radiculopathy (in extremities other than the right upper extremity) was unfitting at the time of military discharge." It was appropriate and within the 2023 ABCMR's authority to consider these medical advisory opinions, in concert with other documents provided by plaintiff, and to weigh the persuasiveness of each document considered as it saw fit. See Meidl v. United States, 114 Fed. Cl. at 618. Plaintiff, in the above captioned case, has not sustained his allegation that the 2023 ABCMR wrongfully ignored the "weekly medical records" he asked it to consider. Rather the 2023 ABCMR did consider them, but found other documents presented on the record before it, including the 2020 medical advisory opinion and the decision of the 2021 ABCMR, which relied on the 2017, 2018, and 2020 medical advisory opinions, more persuasive in reaching its conclusion.

The court finds that the 2023 ABCMR properly addressed Mr. Martin's complaints of radiculopathy-related pain. In support of plaintiff's contention that defendant's arguments are "devoid of the Veteran's [Mr. Martin's] complaints of pain," (alteration added), plaintiff cites to a single page in defendant's motion on which the word "pain" does not occur. The court also notes that plaintiff ignores the passage in the immediately preceding page within the same discussion entitled "Radiculopathy Conditions," in which defendant states:

> With respect to the medical records created within a week of Mr. Martin's fall from the MRAP, reporting hip and leg pain, Mr. Martin does not explain why these records are essential for the [2020] MAO to mention, or why their impacts are not superseded by the multiple direct examinations of Mr. Martin's radiculopathy condition, his MRI scans, or his nerve conduction studies. And indeed, Mr. Martin cannot, because those records are directly on point for the medical condition claimed, while general reports of pain after a recent injury are not.

(alteration added). Furthermore, plaintiff also appears to ignore the numerous references in the 2023 ABCMR decision to his complaints of pain. The 2023 ABCMR noted:

> A MEB convened on 28 March 2014 to evaluate the applicant's medical conditions. The [2014] MEB found the applicant failed medical retention standards based on degenerative disc and joint disease lumbar spine, and degenerative disc and joint disease cervical spine and right upper extremity radiculopathy with muscular atrophy under the provisions (UP) of AR 40-501 and recommended his referral to a PEB. The [2014] MEB found the applicant met medical retention standards for the following conditions:
>
> • right shoulder strain
> • subjective right elbow pain
> • right wrist possible tendinitis
> • degenerative joint disease left hand second finger distal interphalangeal (DIP) joint
> • subjective right hand pain
> • irritable bowel syndrome (IBS)
> • acute erosive gastritis
> • inguinal hernia, bilateral status-post repair
> • bilateral hip pain, no pathology noted
> • bilateral knee pain, no pathology noted
> • unspecified trauma related disorder
> • scar right side of face (right mid-nose to lateral margin of right upper lip)
> • history of acute otitis media, resolved
> • allergic rhinitis
> • GERD
> • hiatal hernia
> • asthma
> • headache syndrome
> • tinea pedis
> • TBI

The 2023 ABCMR noted:

> The Board [2023 ABCMR] compared the medical conditions listed on the LOD with the conditions already deemed unfitting and noted that they are similar. Next the Board reviewed the record to determine whether additional medical conditions should be added as unfitting. The Board first considered the treatment records from the period after the accident. The applicant received medical treatment primarily for a cervical injury with cervical radiculopathy in the right upper extremity documented on an EMG. The records also noted complaints of mid and low back pain with intermittent numbness and tingling in his legs and nonspecific leg pain. An EMG of the right lower extremity was normal.

(alterations added).

Given these statements by the 2023 ABCMR, the record before this court reflects that that 2023 ABCMR considered plaintiff's subjective complaints of pain, but found them less persuasive than documents such as the 2020 medical advisory opinion and the 2014 MEB proceedings' discussion of radiculopathy, which, as noted above, the USAPDA accepted in its 2015 decision. Thus, the 2023 ABCMR examined the documents related to plaintiff's complaints of radiculopathy-induced pain, and gave creditability to the evidence before it. The ABCMR is afforded wide discretion by this court in its decision making, see Kelly v. United States, 69 F.4th 887, 894 (Fed. Cir. 2023), and is entitled to consider a diverse array of documents in the decision-making process. See Meidl v. United States, 114 Fed. Cl. at 618. The 2023 ABCMR properly reviewed the relevant evidence for plaintiff's claims regarding "Radiculopathy in all extremities" and came to a reasoned conclusion based on the documents and circumstances before the 2023 ABCMR. See Heisig v. United States, 719 F.2d at 1156. Plaintiff has not sustained his burden of proving that the 2023 ABCMR's decision relating to the issue of "Radiculopathy in all extremities" was "arbitrary, capricious or not based on substantial evidence." See Chappell v. Wallace, 462 U.S. at 303. Therefore, this court also upholds the decision of the 2023 ABCMR regarding radiculopathy-related pain issues raised by plaintiff.

Regarding plaintiff's third argument, that defendant ignored his gastrointestinal conditions, plaintiff's motion for judgment on the Administrative Record alleges:

> The ABCMR failed to consider Army Regulations that would consider Mr. Martin unfit due to his gastrointestinal conditions. When a military corrections board fails to apply an applicable Army regulation, the Board's decision is contrary to law. A gastrointestinal disorder that causes six months of symptoms and results in prolonged absences from work despite optimal medical treatment is a disqualifying medical condition under Army Reg. 40-501 ¶ 3-16(c)(4). Additionally, a hernia that is not resolved by dietary or medical therapy is a disqualifying condition under Army Reg. 40-501 at ¶ 3-16(g).

(citations omitted).

Defendant responds:

> Mr. Martin injured his groin area during his fall from the MRAP vehicle in September 2009. October 2009, [sic] medical exams reported abdominal pain consistent with bruising and muscle strain, and hiatal and inguinal hernias. Mr. Martin reported pain and diarrhea after this. Mr. Martin's bilateral inguinal hernias were surgically repaired on October 17, 2009. In exams in 2010, Mr. Martin reported intermittent diarrhea. These exams also reported ongoing symptoms of nausea, abdominal pain. Both April and June 2010 exams released him without limitations. An August 2010 exam concluded that Mr. Martins' [sic] symptoms met the criteria for IBS [irritable bowel syndrome]. These medical exams repeatedly show that, while Mr. Martin reports ongoing symptoms, "he does not appear acutely ill," and "[i]n no apparent distress." Medical records show Mr. Martin was briefly released with limitations after his August and September 2010 visits, and his records do not further discuss profile limitations.

In September 2010, an examiner opined that Mr. Martin's hiatal hernia could be contributing to his reflux issues. A March 2011 exam reported continuing GI [gastrointestinal] issues, but Mr. Martin was again released without limitations. In May 2012, on a National Guard Health Assessment, Mr. Martin selected 'yes' that he was deployable to an austere environment within the next 6 months. In addition, no GI condition that would prevent Mr. Martin from performing physical fitness tests or performing military duties was selected on the form. A March 2014 exam showed that Mr. Martin's GI conditions did not require continuous medication to manage and that symptoms were diffuse. A February 2015 esophageal conditions note in Mr. Martin's records indicates that his reflux and hiatal hernia symptoms are controlled with use of medication.

(third alteration in original). Referring specifically to the 2020 Army Review Boards Agency medical advisory opinion, defendant's cross-motion for judgment on the Administrative Record continues:

[T]he medical advisor noted that Mr. Martin's inguinal hernias had been surgically repaired, and that his hiatal hernia was treatable with medication. The advisor further noted that Mr. Martin's reflux condition was treated with Nexium, which did not always accord complete relief, and also explained that Mr. Martin's chronic diarrhea associated with IBS was treated with medication and did not yet require any IBS specific treatment. Regarding the severity of symptoms, the medical advisor made specific note of the fact that no anemia or malnutrition had been associated with Mr. Martin's GI conditions, and none of the conditions required repeat emergency room visits or hospitalization. As with the other conditions discussed here, the medical advisor concluded that Mr. Martin's GI issues met retention standards at the time of REFRAD and at the time of military discharge.

(capitalization in original; alteration added; citations omitted).

Plaintiff's reply argues:

Army regulations do not require repeat hospitalization for gastrointestinal conditions to be considered unfitting. Army Regulation 635-40, which governs the determination of fitness in the context of physical disability, does not explicitly state that repeated hospitalization is a prerequisite for a condition to be deemed unfitting. Instead, the regulation mandates certain presumptions in assessing a physical disability, including the presumption that any disease or injury discovered after a soldier entered active service was incurred in line of duty, unless there is a preponderance of evidence to the contrary. The regulation also requires specific findings of "natural progression" of a pre-existing disease or injury, based on well-established medical principles, to overcome the presumption of military service aggravation. This means that the Board must provide specific evidence that a pre-existing condition naturally progressed into a disqualifying condition that rendered a soldier unfit for duty, and this progression was not aggravated by military service.

. . .

> As for Mr. Martin's hernias, the Defense correctly states that hernias are cause for referral to the DES [disability evaluation system] if they have "severe symptoms not relieved by dietary or medical therapy." Mr. Martin received his surgery in 2009, and his symptoms persisted into 2010. Something acknowledged by the defense. The Defense states that Mr. Martin cannot show his symptoms were severe or that they were not relieved by dietary or medical therapy. The Defense fails to see how a hernia requiring surgery could not be "severe" or how symptoms persisting after the surgery and well into the new year could indicate that the hernia was not relieved by medical therapy.

(alteration and omission added; citations omitted).

Finally, regarding the gastrointestinal issue, defendant's reply indicates that, while referring to the 2020 medical advisory opinion,

> Mr. Martin asserts that the board [the 2023 ABCMR] "seems to believe that because intense visits to the hospital are not noted, a condition does not exist." Mr. Martin misconstrues the board's decision.
>
> The MAO recognized that Mr. Martin "was diagnosed with a series of gastrointestinal conditions" while on active duty. The board [the 2023 ABCMR] also recognized that Mr. Martin had a GI condition, but the board explained that "[t]he mere presence of a disability . . . does not of itself, reflect a failure to meet retention standards or unfitness for military service." After recognizing that Mr. Martin had GI conditions, the MAO and board found the GI conditions met retention standards.
>
> The board's decision is supported by substantial evidence and consistent with applicable regulations. The MAO recognized that Mr. Martin has a series of GI conditions, including gastritis. Army Regulation 40-501 ¶ 3-5 governed gastrointestinal disorders and listed, as a cause for referral to the disability evaluation system, gastritis, "if severe, chronic hypertrophic gastritis with repeated symptomatology and hospitalization, confirmed by gastroscopic examination." The MAO examined and summarized around 39 GI-related medical records with dates from October 2009 to July 2015. The MAO found that Mr. Martin's GI conditions (including gastritis) were being treated with medication or surgery, and that "[n]o anemia or malnutrition has been associated with the gastrointestinal conditions." The MAO also noted that Mr. Martin stated on a National Guard Assessment form in May 2012 that he was "deployable to an austere environment within the next 6 months." Based on a review of Mr. Martin's medical records, [the] board reasonably determined that the GI conditions met retention standards.

(omission in original; first alteration added; citations omitted).

The court notes the 2023 ABCMR's discussion of the plaintiff's "Gastrointestinal Conditions" was not as lengthy as the 2023 ABCMR's discussion of plaintiff's other previously discussed claims, nevertheless, the 2023 ABCMR demonstrated that it had considered the issue, including the historical medical documents as well as plaintiff's concerns, in reaching its conclusion. For example, in response to plaintiff's complaint that "[t]he [2015] PEB failed to properly evaluate the applicant for post-traumatic stress disorder (PTSD) as well as his diagnoses for radiculopathy, residual for right clavicle fracture, and gastrointestinal conditions," the 2023 ABCMR upheld the findings of the 2015 formal PEB which had found "[t]he Soldier [plaintiff] is fit for" "GERD." (alterations added). As defendant notes, the 2023 ABCMR also relied on the 2020 medical advisory opinion, and the 2020 medical advisory opinion which examined plaintiff's "Gastrointestinal Conditions" in great detail. Therefore, the court is satisfied that the 2023 ABCMR conducted a sufficient review of the gastrointestinal complaints presented by plaintiff, and upon such review determined that plaintiff's complaints regarding gastrointestinal complaints were without merit.

Regarding the fourth argument in plaintiff's motion for judgment on the Administrative Record, the combined effect of all conditions, plaintiff argues that the ABCMR had "neglected to consider whether Mr. Martin's Conditions, combined, were unfitting for service." Defendant argues:

> Mr. Martin next contends that the board's [2023 ABCMR] decision is arbitrary and capricious because it "fails to consider Mr. Martin's conditions in combination." Citing Army Regulation 635-40 and McCord v. United States, Mr. Martin argues that "Army regulations require a PEB to consider the "overall effect of all disabilities" [sic] to determine whether a soldier remains fit for duty, and not merely consider conditions in isolation. Mr. Martin is right on the law, but wrong on the facts. He states that the ABCMR erred "by not considering whether Mr. Martin's conditions collectively made him unfit for duty," but in fact the ABCMR did consider this. The 2023 board decision makes clear that it incorporates and relies on previous board decisions in previous remands of this case. This makes sense, as the board is entitled to move forward from issues previously considered and not the subject of any current remand. As discussed above, the PEB findings in Mr. Martin's case, which were credited by the August 14, 2017 medical advisory opinion relied on by the board in its 2018 decision, addressed this issue directly. Those findings make clear that the "combined, overall effect" of Mr. Martin's conditions "are not unfitting" for three reasons: (1) "because the MEB indicates these conditions meet retention standards; (2) because the MEB did "not indicate that any of these conditions cause profile limitations . . ."; and (3) because the MEB did "not indicate that performance issues, if any, are due to these conditions." Mr. Martin does not acknowledge this text in his MJAR [motion for judgment on the Administrative Record]. Mr. Martin thus fails to address the board decision in this regard, and his arguments that his conditions in combination rendered him unfit for duty are effectively his mere disagreement with the medical judgment of the Army.

(alteration added; citations omitted; omission in original). In support of plaintiff's argument on the "combined effects," plaintiff cites to a single United States Court of Federal Claims case: McCord v. United States, 131 Fed. Cl. at 347. In the McCord case, a Judge of this court held that "[p]ursuant to Army Regulations, in making the determination of fitness or unfitness, the PEB is to consider the 'overall effect of all disabilities.'" McCord v. United States, 131 Fed. Cl. at 347 (citing Army Reg. 635-40, Part 3-1(b)) (alteration added).

Plaintiff further argues that

they [the 2023 ABCMR] did not weigh or consider the evidence altogether. The ABCMR erred in relying on medical assessments that it did not review the entire record to support its reaffirmation of the MEB's findings. When viewed in its entirety, the record itself supports Mr. Martin's claim, according to McCord, Ward, et al., which the defense did not address. By showing there were years of consistent reports and documentation showing the severity of Mr. Martin's medical issues, it strengthens Mr. Martin's argument that the entire record is not being reviewed holistically. The Defense reviewed each condition individually but never as a whole.

(alteration added). Plaintiff continues that "[t]he TBI/ health, radiculopathy of extremities, and gastrointestinal conditions have merit because not only are they in the record and ignored, but they were never viewed altogether as a whole, contrary to Dep't of Army, Disability Evaluation for Retention, Retirement, or Separation (January 19, 2017)." (alteration added).

Defendant's reply addresses plaintiff's "combined effects" argument, stating:

Pursuant to Department of Defense Instruction (DoDI) 1332.38, a "member may be determined unfit as a result of the overall effect of two or more impairments even though each of them, standing alone, would not cause the member to be referred into the DES or be found unfit because of physical disability." The board considered Mr. Martin's conditions collectively as required by Army Reg. 635-40 and DoDI 1332.38. Indeed, the [2015] USAPDA decision cites DoDI 1332.38 and lists the conditions for which Mr. Martin was fit for retention. The decision states that in "full consideration of . . . combined, overall effect, the conditions are not unfitting because the MEB indicates these conditions meet retention standards; does not indicate that any of these conditions cause profile limitations . . . and does not indicate that performance issues, if any, are due to these conditions." The board has repeatedly affirmed board [sic] the USAPDA's determination.

Mr. Martin also argues that because the PEB found his degenerative disc disease (DDD) lumbar spine, DDD cervical spine, and right upper extremity radiculopathy were unfitting, the USAPDA was required to find his conditions, when combined, were unfitting. Mr. Martin confuses two issues. First, the USAPDA listed the conditions that were fit for retention, and the USAPDA determined that the conditions were not individually unfitting or unfitting when combined. Second, the USAPDA found that Mr. Martin was

> unfit for military duty based on the two spine conditions and radiculopathy of the right upper extremity. The USAPDA did not need to consider whether the unfitting conditions, when combined, were unfitting because they were already unfitting.

(alterations added; citations omitted; all emphasis and omissions in original). Defendant also addresses the McCord case cited by plaintiff, arguing:

> Mr. Martin finally relies on McCord v. United States, 131 Fed. Cl. 333, 347 (2017) to support his argument that he is entitled to a higher disability rating. Reply at 17. In that case, a physical evaluation board (PEB) "labelled [the service member's] condition as 'DDD of the lumbar spine with radiculopathy of the left lower extremity,'" but the PEB did not consider radiculopathy in assigning a disability rating. McCord, 131 Fed. Cl. at 348. The Court held that the board erred "by failing to direct the Army to similarly assign Mr. McCord a disability rating that took the radicular aspect of his unfitting condition . . . ." Id. The basis for this decision was the fact that the PEB identified the condition as DDD of the lumbar spine with radiculopathy. See id. In contrast, the USAPDA labelled Mr. Martin's unfitting conditions as "degenerative disc disease lumbar spine," "degenerative disc disease cervical spine," and "right upper extremity radiculopathy." The USAPDA found that the right upper extremity radiculopathy unfitting at 30%, with a total combined rating of 70%. Unlike in McCord, the USAPDA properly considered all three unfitting conditions in assigning a disability rating.

(emphasis, alteration, and omission in original; internal references omitted).

Regarding plaintiff's assertion that the 2023 ABCMR did not consider the "combined effects" of his conditions, although the 2023 ABCMR does not include a separate section of analysis on this issue, the 2023 ABCMR specifically upheld the findings of the 2015 USAPDA decision, stating:

> These [conditions under consideration by the 2023 ABCMR] are the same three medical conditions [degenerative disc and joint disease lumbar spine, degenerative disc and joint disease cervical spine, TBI and unspecified trauma related disorder] which USAPDA had determined to have been incurred in the line of duty and compensable. Orders published by USAPDA on 15 December 2015 show the applicant was to be placed on the retirement list with a 70% disability rating effective 19 January 2016.

> . . .

> The Board [2023 ABCMR] determined that a preponderance of the evidence shows the LOD determination [2022 National Guard Bureau line of duty determination] does not change the applicant's medical retirement disposition. The applicant's medical conditions have been thoroughly evaluated and he has had the opportunity to participate, through counsel, throughout this lengthy process. The applicant did not sustain his burden of proving that an error or injustice occurred. The Board denies relief.

(alterations and omission added). In the 2015 decision, the USAPDA considered the combined effect of plaintiff's conditions, explaining:

> The Soldier [plaintiff] is fit for the following conditions MEB Diagnoses 4-23 (right shoulder strain; subjective right elbow pain; right wrist possible tendinitis; DJD left hand send finger DIP joint; subjective right-hand pain; irritable bowel syndrome; acute erosive gastritis; inguinal hernia, bilateral status post repair; bilateral hip pain; bilateral knee pain; unspecified trauma related disorder; scar right side of face - right mid nose to lateral margin of right upper lip; history of acute otitis media; allergic rhinitis; GERD; hiatal hernia; asthma; headache syndrome; tinea pedis; and TBI). In full consideration of DoDI 1332.38, E3.P3, to included combined, overall effect, the conditions are not unfitting because the MEB indicates these conditions meet retention standards; does not indicate that any of these conditions cause profile limitations (functional activities a-h); and does not indicate that performance issues, if any, are due to these conditions.

(alteration added). Thus, when upholding the 2015 USAPDA decision, the 2023 ABCMR also upheld its findings as to the combined effect of plaintiff's conditions. The 2023 ABCMR also "compared the medical conditions listed on the [National Guard Bureau] LOD with the conditions already deemed unfitting and noted that they are similar." (alteration added). Therefore, it was not irrational for the 2023 ABCMR to uphold the findings of the 2015 USAPDA decision regarding the combined effect of plaintiff's conditions. As noted by a Judge of the United States Court of Federal Claims, "[t]he Board is not required to detail its assessment of every piece of evidence in the record, nor resemble 'a model of analytic precision.'" Osburn v. United States, 171 Fed. Cl. at 45 (quoting Dickson v. Sec'y of Def., 68 F.3d at 1404) (alteration added). As explained by a different Judge of the United States Court of Federal Claims:

> Ultimately, "in the context of judicial review of military personnel decisions, '[a]ll that is required is sufficient notification to the serviceman to permit him, if he may, to rebut the [BCNR]'s action.'" Volk v. United States, 111 Fed. Cl. 313, 333–34 (2013) (citing Craft v. United States, 210 Ct. Cl. 170, 181, 544 F.2d 468 (1976)). The Court will uphold a decision of "less than ideal clarity," if the Court can reasonably discern the Board's actions. See Sokol v. United States, 120 Fed. Cl. 144, 151 (2015) (internal quotation omitted).

Dillard v. United States, 165 Fed. Cl. 214, 227 (2023) (alterations in original).

Finally, regarding the exacerbating effects of the 2014 motorcycle accident on plaintiff's conditions, plaintiff's motion for judgment on the Administrative Record asserts:

> The Military also does not appear to consider other conditions that may have resulted from the injury that would have increased his disability rating. If the Military asserts that the accident was not a factor in its determination but that the accident did exacerbate his condition (including those already service-connected), then how can the disability rating not be increased due to the exacerbation by the accident it later acknowledged?

Remember, it was not until March 4, 2022, that the Military acknowledged that the motorcycle incident was ILD. Thus, none of the prior determinations considered the injuries from the motorcycle accident as relevant or an exacerbating condition. In other words, the accident appears void (aside perhaps from conclusory statements) as a factor in any agency determination made by the Defendant of how the injuries from the motorcycle contributed to his overall fitness. The Veteran was in the middle of the MEB/PEB process and as discussed in this brief these service-connected conditions from the motorcycle accident clearly worsened the Veteran's health. Thus, the 2020 MAOs are arbitrary and capricious. Therefore, any document relying on it, e.g., the 2023 ABCMR decision, is clearly arbitrary and capricious.

(alteration added).

Defendant, in its cross-motion for judgment on the Administrative Record, responds:

The board relied on a July 7, 2023 medical advisory opinion when it concluded that the motorcycle accident had no impact on Mr. Martin's disability ratings because the conditions associated with the accident were similar to those already found unfitting. The line of duty determination issued by NGB in 2022 stated that the motorcycle accident "resulted in cervical disc degeneration causing stenosis and radiculopathy, thoracic disc degeneration causing stenosis, and lumbar disc degeneration causing stenosis and radiculopathy." The board compared those medical conditions with the conditions already found unfitting, cervical and lumbar degenerative disc disease, right upper extremity radiculopathy and determined that they were similar.[19] The board also reviewed the record to determine whether additional medical conditions should be added as unfitting, determining from Mr. Martin's treatment records following the motorcycle accident that Mr. Martin had received treatment for "a cervical injury with cervical radiculopathy in the right upper extremity." The July 7, 2023 medical advisory opinion concluded that the LOD conditions were "already included in the compensable conditions" and thus "the LOD determination had no effect on the compensation the applicant was granted and began receiving in 2016."

(alteration and footnote added; citations omitted).

---

[19] At oral argument, defendant's attorney of record argued "the medical advisor's position [in the July 2023 medical advisory opinion] was these [injuries] are similar enough where it's not going to change the rating, and the board [2023 ABCMR] came to the same conclusion." (alterations added). Plaintiff did not contest this assertion that "similar" conditions can lead to identical disability ratings.

Plaintiff's reply brief further argues:

Mr. Martin contends that the ABCMR decision does not properly rely on medical documentation that considered the 2014 motorcycle accident as service connected. Despite the Defense themselves admitting that the motorcycle accident exacerbated Mr. Martin's condition, they then appear to explain how it just didn't exacerbate it enough. The Defense misses the issue. Mr. Martin contends the Board was improper as there is no evidence of any medical analysis in the 2020 MAO that factored the injuries from the accident, given the accident was only found to be ILD <u>two years later</u> in 2022.

The Defense fights this by pointing to the LOD issues in 2022 and showing they compared the LOD to the three unfitting conditions that Mr. Martin was medically retired from in 2016. The Board and the Defense, state that because the conditions were similar and already listed, they "should have no effect on the compensation he was granted in 2016." The Defense then admits the motorcycle accident was found to have caused or exacerbated the conditions that Mr. Martin was rated for, but they committed the same fatal error. The Defense, like the board, fails to discuss how already existing service-connected conditions, which were exacerbated by an auto accident that they concede was service-connected (after years of delay), don't worsen further and thus provide the Veteran with a higher disability rating. This is contrary to the very definition of "exacerbate." The board's decision is arbitrary and capricious because it acknowledges that the Veteran's conditions were exacerbated by the accident but fails to increase his disability rating accordingly.

(citations omitted; emphasis in original).

Regarding plaintiff's assertion that the motorcycle accident's exacerbating effects on plaintiff's conditions should entitle plaintiff to a higher disability rating, defendant argues:

On remand, the board [2023 ABCMR] considered the incremental impact of the accident on Mr. Martin's disability rating. The board determined that there is no impact on the disability rating because the medical conditions found in the LOD determination are similar or identical to the conditions for which Mr. Martin has already been found unfitting. The LOD issued in 2022 stated that the motorcycle accident at issue resulted in cervical disc degeneration causing stenosis and radiculopathy, thoracic disc degeneration causing stenosis, and lumbar disc degeneration causing stenosis and radiculopathy. The board compared these conditions with the three for which Mr. Martin was medically retired and found them similar. The board reviewed post-accident treatment records, which demonstrated that Mr. Martin's symptoms were similar pre-and post-accident.

A medical advisor also summarized the LOD investigation as finding that the [sic] Mr. Martin incurred injuries in the 2014 motorcycle accident of

"Cervical Radiculopathy, Cervicothoracic Spondylosis with Radiculopathy and Lumbar Intervertebral Disc Degenerations," but the medical advisor determined that "[t]hese are the same three medical conditions which USAPDA had determined to have been incurred in the line of duty and compensable." The medical advisor noted that Mr. Martin already had a 70% disability rating based on these unfitting conditions. The medical advisor determined that the "4 May 2022 line of duty determination made by the Army has no effect on the compensation the applicant was granted and began to receive on 19 January 2016."

Mr. Martin disputes the board and medical advisors [sic] determination, but he fails to identify any evidence to support his position.

(third alteration in original; citations omitted).

Regarding plaintiff's complaint that the line of duty determination about the motorcycle accident, and the exacerbating effects of that accident on his preexisting conditions, had not been properly considered by the 2023 ABCMR, the 2023 ABCMR explained how it used and prioritized the medical advisory opinions it considered, stating,

The Board first considered the advisory opinion obtained in connection with the current remand, dated 7 July 2023. The ARBA medical advisor opined that the LOD conditions were already included in the compensable conditions and the LOD determination had no effect on the compensation the applicant was granted and began receiving in 2016. For a more detailed consideration of the medical conditions at issue, the Board turned to the advisory opinion provided in the previous remand, dated 28 July 2020. The medical advisor summarized the pre- and post-accident medical records and opined that the weight of the evidence did not support a finding that radiculopathy (in extremities other than the right upper extremity) was unfitting at the time of military discharge. The medical advisor stated that the applicant's medical conditions were fully and appropriately assessed, and the medical evidence did not support a change in the disability determination in this case. The Board found these opinions persuasive in combination with the contemporaneous medical records.

The 2023 ABCMR further found that "a preponderance of the evidence shows the [May 4, 2022] LOD determination [by the National Guard Bureau] does not change the applicant's medical retirement disposition," (alterations added), because:

the Board [2023 ABCMR] compared the medical conditions listed on the LOD with the conditions already deemed unfitting and noted that they are similar. Next the Board reviewed the record to determine whether additional medical conditions should be added as unfitting. The Board first considered the treatment records from the period after the accident. The applicant received medical treatment primarily for a cervical injury with cervical radiculopathy in the right upper extremity documented on an EMG. The records also noted complaints of mid and low back pain with intermittent

numbness and tingling in his legs and nonspecific leg pain. An EMG of the right lower extremity was normal.

(alteration added).

When contesting the decision of the 2023 ABCMR that the motorcycle accident while in the line of duty, which admittedly exacerbated plaintiff's conditions, nevertheless, did not affect plaintiff's compensable disability percentage, plaintiff once again challenges the 2023 ABCMR's consideration of the medical advisory opinions. In plaintiff's motion for judgment on the Administrative Record, plaintiff argues that "the 2020 MAOs [sic] [medical advisory opinions] are arbitrary and capricious. Therefore, any document relying on it, e.g., the 2023 ABCMR decision, is clearly arbitrary and capricious." (alterations added). Under the discretion afforded the 2023 ABCMR, it was appropriate for the 2023 ABCMR to consult the 2023 and 2020 medical advisory opinions, especially when it did so "in combination with the contemporaneous medical records." The 2023 ABCMR also independently reviewed the decision of the National Guard Bureau to "compare[] the medical conditions listed on the LOD [line of duty] with the conditions already deemed unfitting and noted that they are similar." (alterations added). After this review, the 2023 ABCMR found that the conclusion in the July 2023 medical advisory opinion that "the LOD determination had no effect on the compensation the applicant was granted and began receiving in 2016" was correct because "the LOD conditions were already included in the compensable conditions" leading to plaintiff's disability rating. Plaintiff has failed to demonstrate that the 2023 ABCMR "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the [2023 ABCMR], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (alteration added). This court, therefore, finds that the decision of the 2023 ABCMR that the motorcycle accident did not entitle plaintiff to increased disability compensation was not arbitrary, capricious, unsupported by substantial evidence, or contrary to law. See Martinez v. United States, 333 F.3d at 1314; see also Doyon v. United States, 58 F.4th at 1242; Baude v. United States, 955 F.3d at 1298.

Plaintiff's reply brief also raises one additional issue, which is plaintiff's argument that "the [2023] ABCMR erred when it disregarded the Department of Veterans Affairs (VA) ratings despite the substantial evidence in Mr. Martin's record supporting these ratings at the time of Mr. Martin's discharge." (alteration added). This issue was addressed by the 2023 ABCMR, when the 2023 ABCMR stated: "The Board also considered arguments by [plaintiff's] counsel and notes that counsel repeatedly confuses the Army rules of medical unfitness with the VA regulations about service connection" at the time of plaintiff's discharge. (alteration added). The 2023 ABCMR explained that at the time Mr. Martin retired, different policies governed the VA ratings and the ratings applied by the Army:

The Army rates only conditions determined to be physically unfitting at the time of discharge, which disqualify the Soldier from further military service. The Army disability rating is to compensate the individual for the loss of a military career. The VA does not have authority or responsibility for

determining physical fitness for military service. The VA may compensate the individual for loss of civilian employability. Title 38, U.S. Code, sections 1110 and 1131, permit the VA to award compensation for disabilities which were incurred in or aggravated by active military service. However, an award of a VA rating does not establish an error or injustice on the part of the Army. Title 38, Code of Federal Regulations, Part IV is the VA's schedule for rating disabilities. The VA awards disability ratings to veterans for service-connected conditions, including those conditions detected after discharge. As a result, the VA, operating under different policies, may award a disability rating where the Army did not find the member to be unfit to perform his duties. Unlike the Army, the VA can evaluate a veteran throughout his or her lifetime, adjusting the percentage of disability based upon that agency's examinations and findings.

(internal references omitted).

In sum, the 2023 ABCMR conducted a careful review of the record before it and reviewed numerous documents in the record during the last remand. In doing so, the 2023 ABCMR satisfactorily considered the conditions which plaintiff alleged the 2023 ABCMR had ignored, specifically TBI/mental health, radiculopathy of all extremities, and gastrointestinal conditions. The court also is satisfied that the 2023 ABCMR considered the combined effects of all of plaintiff's medical conditions, as well as the exacerbating effects following the in the line of duty determination. This court, therefore, finds that plaintiff has failed to prove that the 2023 ABCMR's decision was arbitrary, capricious, unsupported by substantial evidence, or otherwise not in accordance with law, including on the ground that defendant "ignored" records. See Chappell v. Wallace, 462 U.S. at 303; Doyon v. United States, 58 F.4th at 1242; Baude v. United States, 955 F.3d at 1298; Lewis v. United States, 458 F.3d at 1376.

At the oral argument on the parties' cross-motions for judgment on the Administrative Record, plaintiff's counsel offered perhaps the most striking indication of his belief that this court can unilaterally alter or mandate the findings of the ABCMR, stating that "[t]his Court can craft an order [for a hypothetical further remand] basically directing the board below to re-examine the conditions that would" "add on to the 70 percent that's already been agreed upon," (alterations added), suggesting this court can, sua sponte, find the plaintiff rightfully medically retired at a baseline of 70%, but permit the ABCMR to consider a higher rating. This is incorrect: "The court's review in these matters is thus limited in scope and deferential in nature." Verbeck v. United States, 97 Fed. Cl. at 451; see also King v. United States, 149 Fed. Cl. at 275 (quoting Skinner v. United States, 219 Ct. Cl. at 331, 594 F.2d at 829) ("The court does not sit as a 'super correction board.'"). This court, therefore, "will not disturb the decision of the Board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." Prestonback v. United States, 965 F.3d at 1368. As demonstrated above, plaintiff has not been able to demonstrate that the decision of the 2023 ABCMR regarding the bases for plaintiff's separation from the armed services was "'arbitrary or capricious, unsupported by substantial evidence, or otherwise not in accordance with law,'" Doyon v. United States, 58 F.4th at 1242 (quoting Fisher v. United States, 402 F.3d at 1180), and this court will not now second-guess the decision of the 2023 ABCMR. See Barnick v. United States, 591

F.3d at 1377; <u>Prestonback v. United States</u>, 965 F.3d at 1368 (citing <u>Chambers v. United States</u>, 417 F.3d at 1227).

## CONCLUSION

The record before the court indicates that the 2023 ABCMR conducted a thorough review of plaintiff's medical records, including those provided by plaintiff, and acted in good faith to amend plaintiff's records, after the various remands produced documents to amend the government's earlier decisions, such as considering the motorcycle accident in the line of duty and adding right upper extremity radiculopathy as an unfitting condition). The 2023 ABCMR considered the extensive medical records before it, along with the 2022 National Guard Bureau line of duty decision, as well as multiple other documents in the record, generated during the multiple remands and motion for reconsideration filed by plaintiff. Plaintiff has failed to prove that the 2023 ABCMR acted arbitrarily or capriciously. As determined by the 2023 ABCMR, Mr. Martin's comprehensive disability rating remains rated at 70%. The court shares Mr. Martin's frustration at the length of time it has taken to reach a conclusion in the above captioned case, however, the court believes the proper result has been reached after the 2023 ABCMR decision. For the foregoing reasons, plaintiff's motion for judgment on the Administrative Record is **DENIED**. Defendant's cross-motion for judgment on the Administrative Record is **GRANTED**. Plaintiff's complaint is now **DISMISSED**. The Clerk's Office shall enter **JUDGMENT** consistent with this Opinion.


**IT IS SO ORDERED**.

<u>s/Marian Blank Horn</u><br>
**MARIAN BLANK HORN**<br>
**Judge**